# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | § | Chapter 11 |
| | § | (Joint Administration Requested) |
| GLOBAL CAPACITY HOLDCO, | § | |
| LLC, et al.[1] | § | Case No. 10-_____ |
| | § | |
| Debtors. | § | |
| | § | |

## AFFIDAVIT OF GEORGE A. KING IN SUPPORT OF CERTAIN FIRST DAY PLEADINGS AND PAPERS

STATE OF NEW YORK  )
                   )  :
COUNTY OF NEW YORK )

On this date, the undersigned authority personally appeared before me, and after being duly sworn, upon his oath, he deposed and stated as follows:

1. My name is George A. King. I am over twenty-one (21) years of age and am competent to make this affidavit (the "Affidavit"). I am the President of Capital Growth Systems, Inc. d/b/a Global Capacity and its affiliated debtor entities (collectively, the "Debtors"). I submit this Affidavit to assist the Court and other parties in interest in understanding the circumstances surrounding the commencement of these chapter 11 cases (the "Cases") and in support of the Debtors' "First Day Motions" filed with the Court. Any capitalized term not expressly defined in this Affidavit will have the meaning set forth in the relevant First Day Motion.

2. Except as otherwise indicated, all facts set forth in this Affidavit are based upon my personal knowledge, my personal interaction with fellow members of the Debtors' senior management and other of the Debtors' advisors, my review of relevant documents, or my opinion based upon my experience and

---

[1] The Debtors in these cases, along with their case numbers, addresses, and the last four digits of each Debtor's federal tax identification number, are: Global Capacity Holdco, LLC, 200 S. Wacker Drive, Suite 1650, Chicago, IL 60606 (10-____) (8858); Global Capacity Group, Inc., 730 North Post Oak Road, Houston, TX 77024 (10-____) (0073); 20/20 Technologies, Inc., 200 South Wacker, Suite 1650, Chicago, IL 60606 (10-____) (5612); Centrepath, Inc., 275 Winter Street, Waltham, MA 02451 (10-____) (9034); Capital Growth Systems, Inc., 200 South Wacker Drive, Suite 1650, Chicago, IL 60606 (10-____) (3505); Global Capacity Direct (f/k/a Vanco Direct USA, LLC), 200 South Wacker Drive, Suite 1650, Chicago, IL 60606 (10-____) (1970); FNS 2007, Inc. (fka Frontrunner Network Systems, Corp.), 200 South Wacker Drive, Suite 1650, Chicago, IL 60606 (10-____) (7892); Nexvu Technologies, LLC, 200 South Wacker Drive, Suite 1650, Chicago, IL 60606 (10-____) (4626); Capital Growth Acquisition, Inc., 200 South Wacker Drive, Suite 1650, Chicago, IL 60606 (10-____) (4116); and 20/20 Technologies I, LLC, 200 South Wacker Drive, Suite 1650, Chicago, IL 60606 (10-____) (5514). The Debtors have filed a motion requesting that these cases be jointly administered.

{00306067-3}

knowledge of the Debtors' operations and financial conditions. If I were called to testify, I would testify competently to the facts set forth in this Affidavit. I am authorized to submit this Affidavit on behalf of the Debtors.

## COMPANY OVERVIEW

### A. Business Overview

3. Capital Growth Systems, Inc. d/b/a Global Capacity consists of five core-operating subsidiary entities from prior acquisitions which are: 20/20 Technologies, Inc. ("20/20"), UK based, Magenta netLogic, Ltd. ("Magenta"), CentrePath, Inc. ("CentrePath"), Global Capacity Group, Inc. ("GCG"), and Global Capacity Direct, LLC fka Vanco Direct USA, LLC ("VDUL").

4. Global Capacity Holdco, LLC is purely a licensing entity and FNS 2007, Inc., NEXVU Technologies, LLC, 20/20 Technologies I, LLC, and Capital Growth Acquisition, Inc. are not currently operating entities.

5. Capital Growth Systems, Inc. was organized as a Florida corporation on September 29, 1999.

6. Capital Growth Systems, Inc. d/b/a Global Capacity ("CGSY", "CGSI", "GC" or the "Company"), the parent and ultimate parent of the other debtor entities is a publicly-traded entity with over 1000 shareholders.

### B. Business of the Debtors

7. The business of the Debtors operates under the trade name Global Capacity and brings to market products that enable their clients to improve the efficiency and cost of their access networks. Access networks are the network links that connect discrete end locations back to a core or backbone network, enabling the delivery of voice and data services to that end location. Within the telecom market, access networks are recognized to be complex and difficult to manage. Access networks represent a $200 billion global market, and are characterized by thousands of discrete suppliers, each operating with disparate pricing, contractual and operational rules and models. Global Capacity has developed a global information base of access network supply and pricing data that enables the Company to more efficiently design and price access solutions for customers. The Company also has robust execution and delivery capability that enable the implementation and management of access networks.

8. The services offered by Global Capacity typically involve pricing, design, implementation and management of network solutions made up of hardware, circuits and services from multiple telecom suppliers to create an integrated customer solution. One specific example is the fact that the Debtors provide the data network for approximately 17% of all the hospital beds in the United States of America. The Company generates margin between the cost it

charges the customer and its cost for the underlying segments that it brings together with its value added services. This source of revenue is consistent and measurable, as it typically involves a fixed monthly fee, payable in advance by the customer, over the term of the contract, which typically runs for a period of one to three years, and is frequently continued on a month to month basis thereafter in the event the circuit is out of term. Contract terms with both the customer and the underlying suppliers are typically matched in terms of contract duration, ensuring continuity between committed revenue and liability for a particular circuit. Global Capacity has developed a global information base of access network supply and pricing data that enables the Company to more efficiently design and price access solutions for customers. The Company also has robust execution and delivery capability that enable the implementation and management of access networks.

9. The Company also generates revenue from the provision of remote management services for third party networks, delivery of engineering services used to design and build out networks for third parties, providing cost savings analysis for the provisioning of services on a contingent fee basis (optimization) and in licensing certain quotation and pricing software that is helpful to other telecom companies in maintaining their own circuits at the lowest cost possible.

10. The Debtors' capabilities include:

- Global market intelligence of telecom supply and pricing data;
- Automated quotation management software;
- Customized access network pricing software;
- Powerful network optimization algorithms, tools and practices;
- Robust network engineering processes and expertise;
- World-class remote network management systems, processes, and expertise; and
- Strategically deployed network aggregation pooling points.

11. The Debtors' goal is to become the leading global telecom information and logistics company providing Network Solutions and Software & Optimization Solutions (both as defined below) to integrators, telecommunications companies, and enterprise customers.

**C. Detailed Product Strategy**

12. The Company has organized its provided offerings between two lines of business, Network Solutions and Software & Optimization Solutions.

13. The Network Solutions Business provides five offerings:

- One Marketplace;
- Network Novations;
- Off-net Extension;
- Network Engineering Services; and
- Remote Network Management Services (RMS).

14. One Marketplace is a physical network platform that acts as an exchange for access networks, aggregating network capacity from multiple suppliers at strategically deployed pooling points, using Global Capacity switching equipment to efficiently match market and customer demand against the available supply of access network connectivity. One Marketplace reduces network costs for clients by providing seamless access to the lowest cost circuits. The Company generates a fixed monthly revenue stream from its customer and generates margin by virtue of a lower monthly cost to the Company for the underlying circuits that it utilizes to deliver this service. The Company is continuously expanding One Marketplace by installing additional aggregation points, and creating interconnections with suppliers (national, regional, and local) to expand the reach and increase the capacity of the platform. One Marketplace revenue and delivery is highly dependent upon a number of critical telecom utility providers who deliver the underlying services of One Marketplace on a monthly basis. Additionally, the Company is dependent upon several critical third party vendors to support the on-going maintenance of the physical network facilities that enable One Marketplace, including collocation facilities, hardware manufacturers, and field dispatch / on-site hardware support. The suppliers are critical to the Company for the following reasons:

- Migrating existing services to new suppliers is time consuming, complex and costly.
- Migrating existing services to new suppliers is potentially service impacting to the end customer, creating the risk of customer defection.
- Migrating existing services to new suppliers would likely result in higher costs, as initial designs were based on lowest cost suppliers to maximize profitability. Migrating services, therefore, would likely reduce the profitability of the services.

15. The Network Novation practice offers to its clients outsourced access network operations, including pricing, procurement, provisioning and network management. These solutions deliver lower access network costs by aggregating customer demand, while also reducing client SG&A associated with managing access network operations solution. The Network Novation practice has a proven process to seamlessly assume the management of

existing network contracts, freeing the client to focus on their core business, while reducing the overall cost of their access network. Each contract provides for a consistent measurable revenue stream from the customer, with the Company generating margin by negotiating a lower cost from the underlying circuit providers both at inception and over the duration of the novation contract. Network Novation revenue and delivery is highly dependent upon a number of critical telecom utility providers who deliver the underlying services of Network Novations on a monthly basis. The suppliers are critical to the Company for the following reasons:

- Migrating existing services to new suppliers is time consuming, complex and costly.
- Migrating existing services to new suppliers is potentially service impacting to the end customer, creating the risk of customer defection.
- Migrating existing services to new suppliers would likely result in higher costs, as initial designs were based on lowest cost suppliers to maximize profitability. Migrating services, therefore, would likely reduce the profitability of the services.

16. Off-net extension services enable the Company to identify, price, procure, provision and support competitive off-net (off network) access services for large clients, providing access to a broad universe of transmission service providers at lower costs. Using the Company's pricing systems, an automated, accurate price quote is generated. The quote is then used along with ordering, procurement, provisioning, test and turn up, and operations hand-off, utilizing the Company's proprietary Circuit Lifecycle Manager (CLM) system, which manages the entire circuit lifecycle. Networks created are then monitored and managed by the Company's 7X24 Network Operations Center (NOC). This service also requires the Company to maintain its vendor group due to the service delays and loss of margin that would be associated with replacing its vendors. Off-net extension revenue and delivery is highly dependent upon a number of critical telecom utility providers who deliver the underlying services of off-net extension on a monthly basis. The suppliers are critical to the Company for the following reasons:

- Migrating existing services to new suppliers is time consuming, complex and costly.
- Migrating existing services to new suppliers is potentially service impacting to the end customer, creating the risk of customer defection.
- Migrating existing services to new suppliers would likely result in higher costs, as initial designs were based on lowest cost suppliers to maximize profitability. Migrating services, therefore, would likely reduce the profitability of the services.

17. Engineering Services enable customers to implement optimized network infrastructure through a suite of services that include the design, engineering, build out, testing and turn-up of complex networks. The Company has built or augmented hundreds of customer networks. These engagements are delivered as non-recurring revenue on a statement of work (SOW) basis. Engineering Services revenue and delivery is highly dependent on a number of critical third party suppliers, including installation related materials (IRM) vendors, shipping and logistics providers, and consulting services firms who provide variable cost labor to address fluctuations in delivery demand. The vendors used for this line of business are critical for the following reasons:

    - Materials and equipment used in the delivery of engineering services are highly specialized and are available from a small number of suppliers.
    - Migrating to new suppliers would result in higher costs, reducing profitability.
    - Receiving credit terms from alternative suppliers would be challenging.

18. The Remote Management Services product offered employs the Company's highly-integrated Operations Support Systems (OSS) and state of the art Network Operations Center (NOC) to deliver network monitoring and management of customer networks. This service is delivered as a stand-alone service for networks not provided by the Company or is bundled as part of a complete network solution delivered via One Marketplace. Remote Management Services provided are proactive, 7X24 monitoring and management services that use automated fault and performance management systems, integrated trouble ticketing and reporting systems, and world-class network engineering and operations expertise to provide service for a customer's most critical networks. Remote Management Services are contracted on a monthly recurring basis. Remote Management Services revenue and delivery is highly dependent on a number of critical third party suppliers including OSS application maintenance providers, data center colocation facility providers, and field dispatch / on-site hardware support. The vendors used for this line of business are critical for the following reasons:

    - Materials and equipment used in the delivery of remote management services are highly specialized, are geographically dependent, and are available from a small number of suppliers.
    - Migrating to new suppliers would result in higher costs, reducing profitability.
    - Receiving credit terms from alternative suppliers would be challenging.

19. The Software & Optimization Business provides three offerings:

- Automated quotation management software;
- Customized access network pricing software; and
- Network optimization consulting.

20. Automated quotation management software enables customers to match customer demand against a global catalog of telecom supply and pricing data to generate an accurate, tariff based quote for the selected services and locations. This automated process replaces the largely manual process most companies continue to rely on and dramatically reduces the amount of time it takes to generate an accurate quote. Automated quotation management software is sold as an annual software license. Automated quotation management revenue and delivery is highly dependent on a number of critical third party suppliers including core application maintenance providers, data and information licensing sources, and data center collocation facility providers.

21. Customized access network pricing software uses the CLM automated quotation management system as a baseline, but customizes the system to include customer specific information such as customer points of presence, negotiated / contracted rates, interconnect points and business rules. The product reduces the cost of generating a customer price quote, automating the generation of customized pricing at a fraction of the costs of generating the same price manually. Customized access network pricing software is sold as an annual software license. Customized access network pricing software revenue and delivery is highly dependent on a number of critical third party suppliers including core application maintenance providers, data and information licensing sources, and data center collocation facility providers.

22. Network optimization consulting uses the CLM pricing coupled with optimization algorithms to work with clients to collect, cleanse, implement, and analyze network data – including inventory, cost, and design data – in order to produce a network optimization report that identifies opportunities to improve the efficiency and reduce the cost of complex global networks. Recommendations include: financial analysis where costs are reduced through identification of overcharges; contractual strategies, including moving services to new tariff structures and novating existing network contracts to more favorable terms. Recommendations also include network redesigns, including migrating networks to more favorable suppliers or aggregating customer demand to achieve better cost points. The Company then employs its logistics capabilities to help customers implement and realize the identified savings. The optimization process typically identifies savings of 2-5% for financial grooming and 15-40% for physical grooming. The Company contracts for Optimization Consulting engagements on a base service fee plus contingent fee basis, where the Company is paid a non-recurring fee based

upon a percentage of the savings achieved from the engagement. Network optimization consulting revenue and delivery is not dependent on any critical third party suppliers.

### D. Existing Capital Structure

23. The Company has issued 168,233,180 common shares outstanding out of an authorized 350,000,000.

24. The Company has warrants outstanding to purchase 181,308,076 shares of common stock with exercise prices ranging from $0.15 to $0.70 per share. The Company also has non-performance related employee options outstanding of 23,748,000 with exercise prices ranging from $0.185 to $1.35 per share and performance related options outstanding of 14,367,000 with exercise prices ranging from $0.185 to $1.00 per share.

25. The outstanding senior secured indebtedness of the Company to Pivotal Global Capacity, LLC ("Senior Lender") is approximately $5.2 million. The Company has borrowed several tranches of secured subordinated convertible debt. The most recent borrowing was in July and August of 2009 (the "July Debentures"), presently totaling approximately $11.9 million plus $0.2 million of PIK interest ($8.2 million net of unamortized OID), which pursuant to intercreditor agreements with the other convertible debt holders is senior to their holdings.

26. In addition, the Company presently has outstanding indebtedness of approximately the following amounts to the other secured debenture holders: (i) $26.9 million to the holders of amended and restated debentures issued in March 2008 ("March Debentures"), net of unamortized OID and debt discount of approximately $18.0 million; (ii) $14.9 million to the holders of debentures issued in November 2008 ("November Debentures"), net of unamortized OID and debt discount of approximately $10.4 million; and (iii) $2.0 million to the holders of debentures issued in July 2009 ("VPP Debentures"), net of unamortized OID and debt discount of approximately $1.5 million.

27. The Company issued an unsecured, interest free convertible debenture to the seller of Global Capacity Direct, LLC to the Company in 2008, which has an outstanding principal amount of $4,000,000; payment of the Seller Debenture is subordinated to payment of all the secured convertible debentures.

28. In addition, the Company through one of its subsidiaries has issued approximately $27,000 of unsecured notes. To summarize, the company has approximately $5.2 million in prepetition senior secured debt to Pivotal, approximately $38.1 million of junior convertible debt net of unamortized OID and debt discount, $4.0 million in general unsecured notes, as well as approximately $15.0 million due to utilities, vendors and suppliers in the ordinary course of business.

### E. Events Leading to the Debtors' Restructuring

29. The Debtors have been required to file for relief due largely to their complex capital structure, lack of liquidity and inability to drive internal growth due to their capital structure and lack of liquidity.

### F. Summary of First Day Pleadings

30. I have read and reviewed the First Day Motions (including the exhibits attached thereto) and the allegations contained in each are true and correct to the best of my knowledge, information, and belief.

31. I believe that the relief sought in each of the First Day Motions (a) is in the best interests of the estates and their creditors; (b) is vital to enable the Debtors to make the transition to, and operate in, chapter 11 with minimum interruption or disruption to their businesses, or loss of productivity or value; and (c) constitutes a critical element in achieving the Debtors' successful reorganization and confirmation of a plan of reorganization.

#### a. Motion for Joint Administration

32. The Debtors seek the joint administration of the Cases for procedural purposes only pursuant to Bankruptcy Rule 1015(b). Joint administration will ease the administrative burden for this Court and the parties in interest and will obviate the need for duplicative notices, motions, applications, and orders, thereby saving considerable time and expenses for the Debtors.

33. The rights of respective creditors of the Debtors will not be adversely affected by joint administration of the Cases. Furthermore, the Court will be relieved of the burden of entering duplicative orders and maintaining redundant files. Finally, supervision of the administrative aspects of the Cases by the Office of the United States Trustee for the Southern District of Texas will be simplified. I believe that joint administration of the Cases is in the best interests of the Debtors, their estates, and all parties in interest, and should be granted in all respects.

#### b. Cash Management Motion

34. Before the commencement of these Cases, the Debtors, in the ordinary course of business, used an automated and integrated cash management system to collect, transfer, and disburse funds generated by their operations, and to accurately record all such transactions as they are made. Importantly, the Debtors' Cash Management System allows for an integrated method for accounting for revenues and expenses to be collected and paid, and permits the Debtors to maintain detailed records of all transfers made.

35. I believe that the Debtors' Cash Management System, which is similar to those

commonly employed by entities of comparable size to the Debtors, allows for overall control of funds and the reduction of administrative costs through a method of coordinating funds collection and movement.

36. I understand that the United States Trustee has established certain operating guidelines for debtors in possession in order to supervise the administration of chapter 11 cases, including the closure of prepetition bank accounts, the opening of new accounts, and the immediate printing of new checks and businesses forms designated "debtor in possession." I believe that strict compliance with such requirements would cause significant and unnecessary disruption in the Debtors' businesses, thereby impairing their efforts to reorganize in a timely manner and pursue other alternatives to maximize the value of their estates.

37. The relief requested in the Cash Management Motion is vital to ensuring the Debtors' seamless transition into bankruptcy. Authorizing the Debtors to maintain their Cash Management System will avoid many of the possible disruptions and distractions that could divert the Debtors' attention from more pressing matters during the initial days of the Cases. I believe that the relief requested in the Cash Management Motion is in the best interests of the Debtors' estates and creditors and is both necessary and appropriate to the efficient administration of those Cases and the Debtors' reorganization efforts.

c. **Employee Wage and Benefits Motion**

38. The Debtors seek to pay their Employees for work preformed prepetition, to honor other prepetition Employee-related obligations and benefits, and to continue paying their Employee obligations in the ordinary course of the Debtors' businesses. In addition, the Debtors seek authorization for applicable banks to receive, process, honor, and pay any and all checks, electronic fund transfers, and automatic payroll transfers drawn on the Debtors' payroll and/or general disbursement accounts, to the extent that such checks or transfers relate to any of the prepetition Employee obligations.

39. As of June 2010, the Debtors employed approximately 85 individuals, of which 72 work on a salaried basis and 14 work on an hourly basis. The Company and its subsidiaries compensate their salaried Employees on a semi-monthly basis, with wages payable on the 15th and last day of each month. All salaried Employees are paid current and not paid in arrears. The Company and its subsidiaries compensate their hourly Employees on the same timetables as the Employees are compensated.

40. The continued operation of the Debtors' businesses and their successful reorganization depends largely upon the retention of the services of the Employees and the maintenance of Employee morale and cooperation. Consequently, it is critical that the Debtors be authorized to satisfy their Employee-related obligations and continue their ordinary course Employee plans, policies, and programs in effect as of the Petition Date. Moreover, if the

checks issued and fund transfers requested in payment of the prepetition Employee obligations are not honored, or if such earned obligations are not timely paid postpetition, the Debtors' Employees could suffer extreme personal hardship and may even be unable, in some instances, to pay their daily living expenses. In addition, it would be inequitable to require the Debtors' Employees to bear personally the cost of any business expenses they incurred prepetition for the benefit of the Debtors with the understanding that they would be reimbursed.

41. The Debtors, in the ordinary course of business, also accrue state, local and federal employment and withholding taxes relating to wages earned by the Debtors' Employees, which taxes are calculated based upon statutorily mandated percentages of earned wages. The Debtors have historically timely paid all Employment and Withholding Taxes to the relevant taxing authority by check or automated transfer as required, which is usually on a monthly or quarterly basis, or immediately prior to, on or within a specified number of days of, each payroll date.

42. I believe that the authority to pay all Employee obligations, including Employment and Withholding Taxes, in accordance with the Debtors' prepetition business practices is in the best interests of the Debtors and their estates and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption and to prevent immediate and irreparable harm to the Debtors. The Debtors had a significant reduction in force prior to the Petition Date and are operating with a diminished staff. Another substantial reduction in force, which would likely occur if Employees were not paid, would cause immediate and irreparable harm to these estates and severely hamper the Debtors' reorganization efforts.

43. The Company is materially dependent on contractors in the following groups: (1) Engineering Services; (2) Operators; and (3) Finance. The Company seeks permission to pay these contractors at the same time as employees on the 15th of each month and the last business day of each month. All "People" are equally material to the operation of the company and preservation of the asset value of the Company.

    d.    **Use of Cash Collateral and DIP Loan Motion**

44. Downtown CP-CGSY, LLC or its nominee ("Downtown Capital" or "Tranche A Lender") and certain holders of Junior Convertible Debentures ("Junior Debentures" and collectively with Downtown Capital, the "DIP Lenders") have agreed to the terms of a facility for the Debtors to obtain DIP Financing and to Cash Collateral use under the DIP Financing terms and conditions. The DIP Lenders are subject to the protections afforded due to providing DIP Financing.

45. In connection with the DIP Financing, the Debtors and the Junior Debentures have negotiated a Plan Support and Restructuring Agreement, which is

attached to the DIP Motion as Exhibit "2". The Plan Support and Restructuring Agreement provides a clear plan for the Debtors' exit out of bankruptcy, i.e. for a capitalized and healthy post-confirmation entity. Pursuant to Plan Support and Restructuring Agreement, the parties have agreed to the terms of a pre-negotiated consensual plan of reorganization to be filed with the Bankruptcy Court. Further, to expedite and ensure the implementation of the Debtors' restructuring, each of the Participating Holders is prepared to commit, on the terms and subject to the conditions of the Plan Support and Restructuring Agreement and applicable law, to, if and when solicited in accordance with applicable bankruptcy law, accept the plan of reorganization and support its confirmation.

46. The Debtors need immediate authorization to use Cash Collateral and the proposed DIP Financing in order to continue operating their businesses. The DIP Lenders are willing to advance funds to the Debtors on the terms and conditions set forth in the proposed order attached to the Motion and the term sheet attached to such order in order to provide funds to the Debtors to assist in their restructuring efforts, to pay critical vendors and utility deposits, to prevent an immediate shutdown to the detriment of all stakeholders, and to pay off the pre-petition secured indebtedness of Pivotal Global Capacity, LLC ("Senior Lien Lender"). The utility deposits are essential for the Debtors to maintain their supply capabilities to their customers, and in order to fund the utility deposits pursuant to the Debtors' Utility Motion, the Debtors will require approximately $3,200,000.00 in cash.

47. The Debtors will use the DIP Facility to pay off the Senior Lien Lender. Paying off the Senior Lien Lender will avoid a priming fight between the Senior Lien Lender and the Junior Lien Lenders. Additionally, the negotiated transaction between the Debtors and the DIP Lenders will result in four (4) classes of bondholders consenting to debtor-in-possession financing and a consensual plan of reorganization, which in turn, will lead to a more efficient and effective reorganization. It is in the best interest of all parties in interest if the Debtors are authorized to use the post-petition financing to pay off the Senior Lien Lender.

48. Having immediate access to that cash and cash collateral that is sufficient to enable the Debtors to operate their businesses and preserve the existing customer base is essential for the reorganization of the Debtors.

49. Absent immediate authority to use Cash Collateral and obtain the DIP Financing to fund their day-to-day operations, I believe that the Debtors could be compelled to shut down their operations and bring the Debtors' businesses to a halt. In sum, the failure to obtain authorization for the use of Cash Collateral and the DIP Financing could be extremely detrimental to the Debtors, and disastrous to their creditors and result in immediate and irreparable harm.

50. I believe the proposed Interim Budget provides for payment of those expenses

which, if not paid, would result in immediate and irreparable harm to the estates. The budgeted amounts (contained in the Interim Budget) are reasonable and necessary, in my opinion.

51. The Debtors have proposed various forms of adequate protection to help protect the prepetition secured lenders against any decrease in the value of their interests in their prepetition collateral for the duration of the requested use of Cash Collateral, thus paving the way for the consensual use of Cash Collateral and a more seamless transition for the Debtors into bankruptcy, including replacement liens in the same type of collateral in which secured creditors held prepetition liens, in their current level of priority and only to the extent their prepetition liens were valid.

52. Given the amount of secured debt, the nature of the Debtors' assets and the financial markets today, I believe as a matter of business judgment that the proposal for the DIP Financing provided by the DIP Lenders is the best alternative under the circumstances to address the Debtors' working capital needs. The Debtors do not believe they could obtain proposals for post-petition financing on terms and conditions more favorable to the Debtors' estates than those offered by the DIP Lenders.

53. Before determining to enter into the DIP Financing upon the terms described in the DIP Financing Motion, the Debtors canvassed the marketplace and conducted lengthy, arm's-length, and good faith negotiations with the DIP Lenders.

54. I am aware that the Debtors investigated and evaluated the Senior Lien Lender's claims and liens prior to the bankruptcy filings. The Debtors negotiated forbearance agreements with respect to the Senior Lien Loan prior to Pivotal's acquisition of that indebtedness, and the Debtors acknowledged in public filings that they have no defenses, counterclaims, offsets, cross-complaints, claims or demands of any kind or nature that would reduce or eliminate all or any part of their liability to pay the Senior Lien Loan. They also waived and released all possible claims, demands, actions, causes of action, damages, costs, expenses and liabilities whatsoever with respect to the Senior Lien Loan. I am aware that Pivotal's acquisition of the Senior Lien Loan was the subject of extensive documentation involving attorneys for all parties in interest, and am not aware of any defenses or claims against Pivotal with respect to its holding of the Senior Lien Loan.

55. The terms of the DIP Financing/Cash Collateral motion include parameters of an acceptable plan of reorganization and deadlines for moving toward plan filing and confirmation that I believe are short but realistic. I believe that a rapid plan process is warranted in this case because of the Debtors' need for liquidating and to maintain its customer relations. The Debtors' balance sheet must be restructured and eliminated before the Debtors can thrive. I believe that the DIP Lenders are willing to be the new equity owner and recapitalize the business so it can succeed, and the Debtors need to proceed as soon as

practicable with a plan to implement that transaction. Without prompt but realistic Plan deadlines, I understand that the DIP Lenders are not willing to fund the DIP Facility, and without the DIP Facility, the Debtors would not be able to operate.

56. Under the circumstances, I believe that the terms and conditions contained in the Interim Order are fair and reasonable and in the best interests of the Debtors' estates and creditors. Based upon my experience in the capital markets, I believe the Structuring Fee for Downtown Capital of $15,000, the Commitment Fee of 2% ($60,000) and an Extension Fee of 1% for each 60 day extension of the Maturity Date for the DIP loan are fair and reasonable.

### e. Motion to Pay Prepetition Sales, Use, Property, Production, and Other Taxes

57. The Debtors, in the ordinary course of business, incur various tax liabilities, including, among others, sales and use taxes, property taxes, production taxes, employment taxes, franchise taxes, and other taxes (the "Taxes"). The process by which the Debtors remit such Taxes varies, depending on the nature of the tax at issue and the taxing authority to which the relevant tax is paid. I am informed that the Debtors historically have timely paid all Taxes to the relevant authority.

58. I have been advised that the federal government and many states in which the Debtors operate have laws providing that, because Taxes constitute "trust fund" taxes, the Debtors' officers or directors or other responsible employees could, under certain circumstances, be held personally liable for payment of such taxes. To the extent any accrued Taxes of the Debtors were unpaid as of the Petition Date in these jurisdictions, the Debtors' officers and directors could be subject to lawsuits during the pendency of these Cases. I believe that this would be extremely distracting for the Debtors' directors and officers, whose full-time focus must be to implement the reorganization strategy embodied by the Plan. Consequently, I believe it is in the Debtors' best interests and the best interests of their creditors to eliminate the possibility of such time-consuming and potentially damaging distractions by authorizing the Debtors to pay any undisputed pre-petition Taxes to the respective Taxing Authorities in the ordinary course of business.

### f. Utility Motion

59. In the ordinary course of their businesses, the Debtors incur utility expenses for water, electricity, natural gas, telephone service, internet service, waste management and other services. Approximately 11 utility providers (collectively, the "Utility Providers") provide these services to the Debtors. I believe that uninterrupted utility services are essential to the Debtors' ongoing operations and to the success of the Cases. Should any Utility Provider refuse or discontinue service, even for a brief period, the Debtors' business operations could be disrupted, and such disruption would jeopardize the

Debtors' reorganization efforts. Thus, I believe it is essential that the utility services continue uninterrupted during the Cases.

60. Based upon cash flow from operations, the Debtors expect to have ample liquidity to timely pay all postpetition obligations owed to their Utility Providers.

61. Nevertheless, I recognize that the Debtors are in arrears on their current obligations to Utility Providers. To provide additional assurance of payment for future services to the Utility Providers, I understand that the Debtors propose to provide a deposit to each requesting Utility Provider in an amount equal to thirty (30) days' worth of the utility service as calculated by the Debtors according to the last historical 52-week period ("Adequate Assurance Deposit" and together with the cash flow from operations and a commitment to satisfy Utility Provider claims under a plan, collectively, the "Proposed Adequate Assurance"); provided, however, that Utility Providers may object to the Proposed Adequate Assurance if (a) such a request is made in writing no later than thirty (30) days after the date upon which the Emergency Motion for Interim and Final Orders Providing Adequate Assurance of Utility Payment is filed (the "Request Deadline"); (b) such requesting Utility Provider does not already hold a deposit equal to or greater than the Adequate Assurance Deposit (which existing deposit shall be deemed to be the Adequate Assurance Deposit); and (c) such requesting Utility Provider is not currently paid in advance for its services. I believe that the Proposed Adequate Assurance provides the protection required to grant sufficient adequate assurance to the Utility Providers.

### g. Critical Vendors Motion

62. I believe that as a result of the commencement of these chapter 11 cases, some of the Debtors' vendors will refuse to continue providing goods and services to the Debtors, at least under existing credit terms, unless the Debtors are authorized to pay certain of their prepetition claims on a timely basis as if these bankruptcy cases had never been filed. Any inability to keep paying Debtors' accounts on a current basis would hinder the Debtors' ability to continue in business and cause termination of services for clients. If the Debtors are unable to continue to pay the critical vendors in the ordinary course of business, the Debtors will be unable to maintain both the appropriate level of operating liquidity required by Debtors' business plan and the crucial and essential levels of supplies and essential services that are necessary to maintain their operations as going concerns.

63. I am confident that the few vendors listed on an exhibit to the Debtors' motion to pay critical vendors are in fact essential to the uninterrupted function of the Debtors' business operations. As a condition to receiving payment, the Debtors will require that each vendor agree to provide goods or services post-petition on credit terms that are mutually acceptable to the Debtors and that vendor.

{00306067-3} 15

64. The Debtors are seeking the authority to pay approximately $253,000, which represents a small percentage of the Debtors' estimated combined prepetition unsecured debt. The critical vendors consist of vendors that comprise the backbone of the "network" for the complex communication services that the Debtors provide to their customers, such as internet, cable and wireless phone services. Other vendors supply personnel or other services that are critical to the Debtors' delivery of services, creation of networks and the creation of revenue. The component services provided by the vendors listed in the exhibit to the Debtors' critical vendor motion are necessary and critical components of the services provided by the Debtors to their customers. Without the provision of their services, Debtors would be unable to generate the projected revenue in Chapter 11, and could fail in their attempt to reorganize.

## CONCLUSION

65. The Debtors' ultimate goal is to quickly reorganize under a confirmed plan. In the near term, however, to minimize any loss of value of their businesses during the restructuring, the Debtors' immediate objective is to maintain a business-as-usual atmosphere during the pendency of these Cases, with as little interruption or disruption to the Debtors' operations as possible. I believe that if the Court grants the relief requested in each of the First Day Motions, the prospect for achieving these objectives and completing a successful, rapid reorganization of the Debtors' businesses will be substantially enhanced.

66. I believe that approval of the First Day Motions is in the best interests of all stakeholders and in the best interests of the estates.

67. I declare under penalty of perjury that the foregoing is true and correct.

FURTHER AFFIANT SAYETH NAUGHT.

Signed: July ___, 2010

By: _____
Name: George A. King
Title: President

Sworn to and subscribed before me this 21 day of July, 2010.

_____
NOTARY PUBLIC

Kathlyn M. Schwartz
Notary Public, State of New York
No. 02SC6213930
Qualified in Westchester County
Commission Expires November 23, 2013

{00306067-3}                                16