# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | § § | |
| GLOBAL CAPACITY HOLDCO, LLC | § § | CASE NO. 10- |
| DEBTOR | § § | (Chapter 11) |
| IN RE: | § § | |
| GLOBAL CAPACITY GROUP, INC. | § § | CASE NO. 10- |
| DEBTOR | § § | (Chapter 11) |
| IN RE: | § § | |
| 20/20 TECHNOLOGIES, INC. | § § | CASE NO. 10- |
| DEBTOR | § § | (Chapter 11) |
| IN RE: | § § | |
| CENTREPATH, INC. | § § | CASE NO. 10- |
| DEBTOR | § § | (Chapter 11) |
| IN RE: | § § | |
| CAPITAL GROWTH SYSTEMS, INC. | § § | CASE NO. 10- |
| DEBTOR | § § | (Chapter 11) |
| IN RE: | § § | |
| GLOBAL CAPACITY DIRECT (f/k/a VANCO DIRECT USA, LLC | § § § | CASE NO. 10-<br><br>(Chapter 11) |
| DEBTOR | § § | |

| | | |
|---|---|---|
| IN RE: | § § | |
| FNS 2007, INC. (fka FRONTRUNNER NETWORK SYSTEMS, CORP.) | § § § | CASE NO. 10- (Chapter 11) |
| DEBTOR | § § | |
| IN RE: | § § | |
| NEXVU TECHNOLOGIES, LLC | § § | CASE NO. 10- |
| DEBTOR | § § | (Chapter 11) |
| IN RE: | § § | |
| 20/20 TECHNOLOGIES I, LLC | § § | CASE NO. 10- |
| DEBTOR | § § § | (Chapter 11) |
| IN RE: | § § | CASE NO. 10- |
| CAPITAL GROWTH ACQUISITION, INC. | § § § | |
| DEBTOR | § | (Chapter 11) |

## MOTION FOR JOINT ADMINISTRATION OF CASES

The above-referenced debtors and debtors in possession (collectively, the "Debtors"), by and through proposed undersigned counsel, hereby move this Court (the "Motion") pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 1015-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), for entry of an order, the proposed form of which is attached hereto as Exhibit "A," directing joint administration of the Debtors' respective estates. In

support of this Motion, the Debtors respectfully submit as follows:

## JURISDICTION, VENUE AND PREDICATE FOR RELIEF REQUESTED

1. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157. This Motion concerns the administration of the estates; and therefore, it is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A).

2. Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3. The statutory predicate for the relief requested herein is section 105(a) of the of Title 11 of the United States Bankruptcy Code ("Bankruptcy Code"). The relief sought herein is also appropriate under Bankruptcy Rule 1015(b) and Local Rule 1015-1.

## PROCEDURAL BACKGROUND

**A.  Procedural History**

4. On the date of this Motion (the "Petition Date"), the Debtors each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), thereby commencing the above-captioned bankruptcy cases (collectively, the "Cases").

5. The Debtors are authorized to continue to operate their businesses and manage their properties as debtors in possession pursuant to Bankruptcy Code §§ 1107(a) and 1108.

6. As of the date of this Motion, no official committee of unsecured creditors has been appointed.

**B.  Company Background**

7. Capital Growth Systems, Inc. d/b/a Global Capacity consists of five core-

operating subsidiary entities from prior acquisitions which are: 20/20 Technologies, Inc. ("20/20"), UK based, Magenta netLogic, Ltd.[1] ("Magenta"), CentrePath, Inc. ("CentrePath"), Global Capacity Group, Inc. ("GCG"), and Global Capacity Direct, LLC fka Vanco Direct USA, LLC ("VDUL").

8. Global Capacity Holdco, LLC is purely a licensing entity and FNS 2007, Inc., NEXVU Technologies, LLC, 20/20 Technologies I, LLC and Capital Growth Acquisition, Inc. are not currently operating entities.

9. Capital Growth Systems, Inc. was organized as a Florida corporation on September 29, 1999.

10. Capital Growth Systems, Inc. d/b/a Global Capacity ("CGSY", "CGSI", "GC" or the "Company"), is a publicly-traded telecom information and logistics provider that employs the intellectual property, processes, and expertise of its subsidiary companies (who have also filed for relief under Chapter11) to deliver products and services to its customers. The business of the Debtors operates under the trade name Global Capacity and brings to market products that enable their clients to improve the efficiency and cost of their access networks. Access networks are the network links that connect discrete end locations back to a core or backbone network, enabling the delivery of voice and data services to that end location. Within the telecom market, access networks are recognized to be complex and difficult to manage. Access networks represent a $200 billion global market, and are characterized by thousands of discrete suppliers, each operating with disparate pricing, contractual and operational rules and models. Global Capacity has developed a global information base of access network supply and pricing data that enables the Company to more efficiently design and price

---

[1] Magent is a non-filing entity.

access solutions for customers. The Company also has robust execution and delivery capability that enable the implementation and management of access networks.

11. The services offered by Global Capacity typically involve pricing, design, implementation and management of network solutions made up of hardware, circuits and services from multiple telecom suppliers to create an integrated customer solution. The Company generates margin between the cost it charges the customer and its cost for the underlying segments that it brings together with its value added services. This source of revenue is consistent and measurable, as it typically involves a fixed monthly fee, payable in advance by the customer, over the term of the contract, which typically runs for a period of one to three years, and is frequently continued on a month to month basis thereafter in the event the circuit is out of term. Contract terms with both the customer and the underlying suppliers are typically matched in terms of contract duration, ensuring continuity between committed revenue and liability for a particular circuit. Global Capacity has developed a global information base of access network supply and pricing data that enables the Company to more efficiently design and price access solutions for customers. The Company also has robust execution and delivery capability that enable the implementation and management of access networks.

12. The Company also generates revenue from the provision of remote management services for third party networks, delivery of engineering services used to design and build out networks for third parties, providing cost savings analysis for the provisioning of services on a contingent fee basis (optimization) and in licensing certain quotation and pricing software that is helpful to other telecom companies in maintaining their own circuits at the lowest cost possible.

13. The Debtors' capabilities include:

- Global market intelligence of telecom supply and pricing data;
- Automated quotation management software;
- Customized access network pricing software;
- Powerful network optimization algorithms, tools and practices;
- Robust network engineering processes and expertise;
- World-class remote network management systems, processes, and expertise; and
- Strategically deployed network aggregation pooling points.

14. The Debtors' goal is to become the leading global telecom information and logistics company providing Network Solutions and Software & Optimization Solutions to integrators, telecommunications companies, and enterprise customers.

15. The Company has organized its provided offerings between two lines of business, Network Solutions and Software & Optimization Solutions.

16. The Network Solutions Business provides five offerings:

- One Marketplace;
- Network Novations;
- Off-net Extension;
- Network Engineering Services; and
- Remote Network Management Services (RMS).

17. *One Marketplace* is a physical network platform that acts as an exchange for access networks, aggregating network capacity from multiple suppliers at strategically deployed pooling points, using Global Capacity switching equipment to efficiently match market and customer demand against the available supply of access network connectivity. *One Marketplace* reduces network costs for clients by providing seamless access to the lowest cost circuits. The Company generates a fixed monthly revenue stream from its

customer and generates margin by virtue of a lower monthly cost to the Company for the underlying circuits that it utilizes to deliver this service. The Company is continuously expanding *One Marketplace* by installing additional aggregation points, and creating interconnections with suppliers (national, regional, and local) to expand the reach and increase the capacity of the platform. *One Marketplace* revenue and delivery is highly dependent upon a number of critical telecom utility providers who deliver the underlying services of *One Marketplace* on a monthly basis. Additionally, the Company is dependent upon several critical third party vendors to support the on-going maintenance of the physical network facilities that enable *One Marketplace*, including collocation facilities, hardware manufacturers, and field dispatch / on-site hardware support. The suppliers are critical to the Company for the following reasons:

- Migrating existing services to new suppliers is time consuming, complex and costly.
- Migrating existing services to new suppliers is potentially service impacting to the end customer, creating the risk of customer defection.
- Migrating existing services to new suppliers would likely result in higher costs, as initial designs were based on lowest cost suppliers to maximize profitability. Migrating services, therefore, would likely reduce the profitability of the services.

18. The *Network Novation* practice offers to its clients outsourced access network operations, including pricing, procurement, provisioning and network management. These solutions deliver lower access network costs by aggregating customer demand, while also reducing client SG&A associated with managing access network operations solution. The N*etwork Novation* practice has a proven process to seamlessly assume the management of existing network contracts, freeing the client to

focus on their core business, while reducing the overall cost of their access network. Each contract provides for a consistent measurable revenue stream from the customer, with the Company generating margin by negotiating a lower cost from the underlying circuit providers both at inception and over the duration of the novation contract. *Network Novation* revenue and delivery is highly dependent upon a number of critical telecom utility providers who deliver the underlying services of *Network Novations* on a monthly basis. The suppliers are critical to the Company for the following reasons:

- Migrating existing services to new suppliers is time consuming, complex and costly.
- Migrating existing services to new suppliers is potentially service impacting to the end customer, creating the risk of customer defection.
- Migrating existing services to new suppliers would likely result in higher costs, as initial designs were based on lowest cost suppliers to maximize profitability. Migrating services, therefore, would likely reduce the profitability of the services.

19. Off-net extension services enable the Company to identify, price, procure, provision and support competitive off-net (off network) access services for large clients, providing access to a broad universe of transmission service providers at lower costs. Using the Company's pricing systems, an automated, accurate price quote is generated. The quote is then used along with ordering, procurement, provisioning, test and turn up, and operations hand-off, utilizing the Company's proprietary Circuit Lifecycle Manager (CLM) system, which manages the entire circuit lifecycle. Networks created are then monitored and managed by the Company's 7X24 Network Operations Center (NOC). This service also requires the Company to maintain its vendor group due to the service delays and loss of margin that would be associated with replacing its vendors. Off-net

extension revenue and delivery is highly dependent upon a number of critical telecom utility providers who deliver the underlying services of off-net extension on a monthly basis. The suppliers are critical to the Company for the following reasons:

- Migrating existing services to new suppliers is time consuming, complex and costly.
- Migrating existing services to new suppliers is potentially service impacting to the end customer, creating the risk of customer defection.
- Migrating existing services to new suppliers would likely result in higher costs, as initial designs were based on lowest cost suppliers to maximize profitability. Migrating services, therefore, would likely reduce the profitability of the services.

20. Engineering Services enable customers to implement optimized network infrastructure through a suite of services that include the design, engineering, build out, testing and turn-up of complex networks. The Company has built or augmented hundreds of customer networks. These engagements are delivered as non-recurring revenue on a statement of work (SOW) basis. Engineering Services revenue and delivery is highly dependent on a number of critical third party suppliers, including installation related materials (IRM) vendors, shipping and logistics providers, and consulting services firms who provide variable cost labor to address fluctuations in delivery demand. The vendors used for this line of business are critical for the following reasons:

- Materials and equipment used in the delivery of engineering services are highly specialized and are available from a small number of suppliers.
- Migrating to new suppliers would result in higher costs, reducing profitability.
- Receiving credit terms from alternative suppliers would be challenging.

21. The Remote Management Services product offered employs the

Company's highly-integrated Operations Support Systems (OSS) and state of the art Network Operations Center (NOC) to deliver network monitoring and management of customer networks. This service is delivered as a stand-alone service for networks not provided by the Company or is bundled as part of a complete network solution delivered via *One Marketplace*. Remote Management Services provided are proactive, 7X24 monitoring and management services that use automated fault and performance management systems, integrated trouble ticketing and reporting systems, and world-class network engineering and operations expertise to provide service for a customer's most critical networks. Remote Management Services are contracted on a monthly recurring basis. Remote Management Services revenue and delivery is highly dependent on a number of critical third party suppliers including OSS application maintenance providers, data center colocation facility providers, and field dispatch / on-site hardware support. The vendors used for this line of business are critical for the following reasons:

- Materials and equipment used in the delivery of remote management services are highly specialized, are geographically dependent, and are available from a small number of suppliers.
- Migrating to new suppliers would result in higher costs, reducing profitability.
- Receiving credit terms from alternative suppliers would be challenging.

22. The Software & Optimization Business provides three offerings:

- Automated quotation management software;
- Customized access network pricing software; and
- Network optimization consulting.

23. Automated quotation management software enables customers to match customer demand against a global catalog of telecom supply and pricing data to generate an accurate, tariff based quote for the selected services and locations. This automated

{00306080-2} 10

process replaces the largely manual process most companies continue to rely on and dramatically reduces the amount of time it takes to generate an accurate quote. Automated quotation management software is sold as an annual software license. Automated quotation management revenue and delivery is highly dependent on a number of critical third party suppliers including core application maintenance providers, data and information licensing sources, and data center collocation facility providers.

24. Customized access network pricing software uses the CLM automated quotation management system as a baseline, but customizes the system to include customer specific information such as customer points of presence, negotiated / contracted rates, interconnect points and business rules. The product reduces the cost of generating a customer price quote, automating the generation of customized pricing at a fraction of the costs of generating the same price manually. Customized access network pricing software is sold as an annual software license. Customized access network pricing software revenue and delivery is highly dependent on a number of critical third party suppliers including core application maintenance providers, data and information licensing sources, and data center collocation facility providers.

25. Network optimization consulting uses the CLM pricing coupled with optimization algorithms to work with clients to collect, cleanse, implement, and analyze network data – including inventory, cost, and design data – in order to produce a network optimization report that identifies opportunities to improve the efficiency and reduce the cost of complex global networks. Recommendations include: financial analysis where costs are reduced through identification of overcharges; contractual strategies, including moving services to new tariff structures and novating existing network contracts to more

favorable terms. Recommendations also include network redesigns, including migrating networks to more favorable suppliers or aggregating customer demand to achieve better cost points. The Company then employs its logistics capabilities to help customers implement and realize the identified savings. The optimization process typically identifies savings of 2-5% for financial grooming and 15-40% for physical grooming. The Company contracts for Optimization Consulting engagements on a base service fee plus contingent fee basis, where the Company is paid a non-recurring fee based upon a percentage of the savings achieved from the engagement. Network optimization consulting revenue and delivery is not dependent on any critical third party suppliers.

### C. Existing Capital Structure

26. The Company has issued 168,233,180 common shares outstanding out of an authorized 350,000,000.

27. The Company has warrants outstanding to purchase 181,308,076 shares of common stock with exercise prices ranging from $0.15 to $0.70 per share. The Company also has non-performance related employee options outstanding of 23,748,000 with exercise prices ranging from $0.185 to $1.35 per share and performance related options outstanding of 14,367,000 with exercise prices ranging from $0.185 to $1.00 per share.

28. The outstanding senior secured indebtedness of the Company to Pivotal Global Capacity, LLC ("Senior Lender") is approximately $5.2 million. The Company has borrowed several tranches of secured subordinated convertible debt. The most recent borrowing was in July and August of 2009 (the "July Debentures"), presently totaling approximately $11.9 million plus $0.2 million of PIK interest, which pursuant to intercreditor agreements with the other convertible debt holders is senior to their

holdings.

29. In addition, the Company presently has outstanding indebtedness of approximately the following amounts to the other secured debenture holders: (i) $26.9 million to the holders of amended and restated debentures issued in March 2008 ("March Debentures"), net of unamortized OID and debt discount of approximately $25.1 million; (ii) $14.9 million to the holders of debentures issued in November 2008 ("November Debentures"), net of unamortized OID and debt discount of approximately $14.1 million; and (iii) $2.0 million to the holders of debentures issued in November 2008 ("VPP Debentures"), net of unamortized OID and debt discount of approximately $1.6 million. The Company issued an unsecured, interest free convertible debenture to the seller of Global Capacity Direct, LLC to the Company in 2008, which has an outstanding principal amount of $4,000,000; payment of the Seller Debenture is subordinated to payment of all the secured convertible debentures.

30. In addition, the Company through one of its subsidiaries has issued approximately $27,000 of unsecured notes. To summarize, the company has approximately $5.2 million in prepetition senior secured debt to Pivotal, approximately $55.9 million of junior convertible debt, $4.0 million in general unsecured notes, as well as approximately $15.0 million due to utilities, vendors and suppliers in the ordinary course of business.

31. The Companies had revenue during the last year of $64.4 million.

## RELIEF REQUESTED

32. By this Motion, the Debtors seek the entry of an Order, pursuant to section 105(b) of the Bankruptcy Code, Bankruptcy Rule 1015(b) and Local Rule 1015-1,

authorizing the joint administration of the Cases for the following procedural purposes:

    a. One docket shall be maintained for the Debtors' Cases, under the case number assigned to Global Capacity Holdco, LLC.

    b. All pleadings, orders, and other papers filed shall be captioned *In re Global Capacity Holdco, LLC., et al.,* Case No. 10-_____ (Jointly Administered).

    c. The Office of the U.S. Trustee (the "Trustee") should conduct joint informal meetings with the Debtors, as required, and a joint first meeting of creditors, if required.

    d. One plan and disclosure statement may be filed for all Cases by any plan proponent; however, substantive consolidation is not being requested at this time.

    e. Unless otherwise ordered by the Court, each Debtor will file separate Schedules of Assets and Liabilities and Statements of Financial Affairs, and as applicable, Lists of Equity Security Holders.

    f. Proofs of claim filed by creditors of any Debtor shall reflect the caption and case number of the Debtor to which the claim relates and in whose case such claim is to be filed.

    g. A separate claims register shall be maintained for each Debtor.

## BASIS FOR RELIEF REQUESTED

33. Bankruptcy Rule 1015(b) and Local Rule 1015-1 specifically allow for the joint administration of bankruptcy cases involving a debtor and its affiliates. *See* Fed. R. Bankr. P. 1015(b); Local Rule 1015-1. Bankruptcy Rule 1015(b) provides, in relevant part, that: "[i]f . . . two or more petitions are pending in the same court by or against . . . a debtor and an affiliate, the court may order a joint administration of the estates of such debtor and its affiliates. Fed. R. Bank. P. 1015(b).

34. Additionally, Local Rule 1015-1 provides that this Court may order joint administration without notice or a hearing upon the filing of a motion requesting such joint administration and an affidavit or verification establishing that joint administration

is warranted. The *Affidavit of George King in Support of First Day Pleadings and Papers,* establishes that joint administration of these cases is warranted because all of the Debtors are "affiliates," under Bankruptcy Code § 101(2). See 11 U.S.C. § 101(2). Therefore, joint administration of the Debtors' Cases is appropriate under Bankruptcy Rule 1015(b). Further, joint administration of the Debtors' estates will be less costly and burdensome than the separate administration of the estates. For example, joint administration will permit the use of a single, general docket for the Debtors' Cases and combined notices to creditors and other parties in interest of the Debtors' respective estates. The Debtors believe it is likely that numerous filings and additional matters, including notices, applications, motions, orders, hearings and other proceedings will be made, issued or convened in these Cases. Many of these will affect all of the Debtors. Joint administration will protect parties in interest by ensuring that parties affected by each of the Debtors' respective Cases will be apprised of the various matters before the Court in those Cases.

35. Joint administration of the Debtors' estates will also avoid repetitive, duplicative, and potentially confusing filings by permitting counsel for all parties in interest to (a) use a single caption on the numerous documents that will be filed and served in the Debtors' Cases, and (b) file documents in only one of the Debtors' Cases rather than in multiple Cases.

36. Moreover, joint supervision of the administrative aspects of the Cases by the Trustee and the Court will be simplified. As such, joint administration will promote the economical and efficient administration of the Debtors' estates to the benefit of the Debtors, their respective creditors, the Trustee and the Court.

37. The rights of the respective creditors of each of the estates will not be prejudiced by the joint administration of the Cases because the relief sought is purely procedural and is not intended to affect substantive rights. Each creditor will be entitled to file a proof of claim against the particular estate in which it allegedly has a claim or right and will retain whatever claims or rights it has against that particular estate. Further, all schedules of assets and liabilities and statements of financial affairs will be captioned and filed separately in each of the Cases, as appropriate.

38. Debtor Global Capacity Holdco, LLC is an affiliate of each of the other Debtors in the above-captioned Cases. Since Global Capacity Holdco, LLC is the lowest-numbered case, the Debtors request joint administration under that case. The Debtors propose that the Court establish the following official caption to be used by all parties in all pleadings in the Debtors' jointly administered Cases, except as otherwise specifically provided herein:

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| IN RE: | § Chapter 11 |
| | § (Joint Administration) |
| GLOBAL CAPACITY HOLDCO, | § |
| LLC, et al.[1] | § Case No. 10-_____ |
| | § |
| Debtors. | § |

---

[1] The Debtors in these cases, along with their case numbers, addresses, and the last four digits of each Debtor's federal tax identification number, are: Global Capacity Holdco, LLC, 200 S. Wacker Drive, Suite 1650, Chicago, IL 60606 (10-____) (8858); Global Capacity Group, Inc., 730 North Post Oak Road, Houston, TX 77024 (10-____) (0073); 20/20 Technologies, Inc., 200 South Wacker, Suite 1650, Chicago, IL 60606 (10-____) (5612); Centrepath, Inc., 275 Winter Street, Waltham, MA 02451 (10-____) (9034); Capital Growth Systems, Inc., 200 South Wacker Drive, Suite 1650, Chicago, IL 60606 (10-____) (3505); Global Capacity Direct (f/k/a Vanco Direct USA, LLC), 200 South Wacker Drive, Suite 1650, Chicago, IL 60606 (10-____) (1970); FNS 2007, Inc. (fka Frontrunner Network Systems, Corp.), 200 South Wacker Drive, Suite 1650, Chicago, IL 60606 (10-____) (7892); Nexvu Technologies, LLC, 200 South Wacker Drive, Suite 1650, Chicago, IL 60606 (10-____) (4626); Capital Growth Acquisition, Inc., 200 South Wacker Drive, Suite 1650, Chicago, IL 60606 (10-____) (4116); and 20/20 Technologies I, LLC, 200 South Wacker Drive, Suite 1650, Chicago, IL 60606 (10-____) (5514). The Debtors have filed a motion requesting that these cases be jointly administered.

39. The Debtors submit that all parties' use of the simplified caption designated above will eliminate cumbersome and confusing procedures and ensure a uniformity of pleading identification.

40. The Debtors also seek this Court's direction that a notation substantially similar to the following be entered on the docket of each of the Debtors' Cases to reflect the joint administration of these Cases:

> An Order has been entered in this case consolidating this case with the case of Global Capacity Holdco, LLC, *et al.*, Case No. 10-_____ for procedural purposes only and providing for its joint administration in accordance with the terms of such Order. The docket in Case No. 10-_____ should be consulted for all matters affecting this case.

41. No administrative or scheduling orders previously entered in the Cases will require modification if this Motion is granted. Mailing lists in each of the Cases will be consolidated for future noticing requirements.

42. No prior motion for the relief requested herein has been made to this or any other Court.

## NOTICE

45. Notice of this pleading has been provided by e-mail, facsimile, or overnight delivery to: (a) the Office of the United States Trustee for the District of Delaware; (b) Pivotal Global Capacity, LLC; (c) the Junior Creditors and Second Lien Lenders comprised of: Enable Growth Partners, LP and Enable Opportunity Partners, LP, Black River Samll Capitalization Fnd, Ltd., Midsummer Investments, Aequitas Catalyst Fund, LLC, David Lies, Micro Pipe Fund I, LLC, Chestnut Ridge Partners, LP, Whalehaven Capital Fund, Limited, Capstone Investments, Carl Greer Trust, L. Jason

Diamond, Michael Balkin, Sam Zarcone, Hudson Bay Funds, LP and Hudson Bay Overseas Fund, Ltd., Mickelson Investments, Shefsky & Froelich, Ltd., Richard A. Levy, Patrick Shutt, George King, Robert Pollan, and Elinore DeWart Killebrew Revocable Trust; (d) Alan J. Brody, Greenberg Traurig, LLP, 200 Park Avenue, Florham Park, NJ 07932-0677; Jeffrey M. Wolf, Greenberg Traurig, LLP, One International Place, Boston, MA 02110; Adam H. Friedman, Olshan Grundman Frome Rosenzweig & Wolosky LLP, Park Avenue Tower, 65 East 55th Street, New York, NY 10022; Theodore Raffetto, Reliance Globalcom, 200 S. Wacker Drive, Suite 1600, Chicago, IL 60606; and (e) the Debtors' 20 largest unsecured creditors as set forth in the consolidated list filed with the Debtors' petitions. In light of the nature of the relief requested, the Debtors submit that no further notice is required.

**WHEREFORE,** the Debtors respectfully request that the Court enter an order, substantially in the form annexed hereto as **Exhibit A,** granting the relief requested herein. The Debtors also request such other and further relief to which they may be justly entitled.

Dated: Wilmington, Delaware
July __, 2010

                    **WOMBLE CARLYLE SANDRIDGE & RICE, PLLC**

                    Francis A. Monaco, Jr. (DE Bar No. 2078)
                    Mark L. Desgrosseilliers (DE Bar No. 4083)
                    Thomas M. Horan (DE Bar No. 4641)
                    222 Delaware Avenue, Suite 1501
                    Wilmington, DE 19801
                    Telephone: (302) 252-4320
                    Facsimile: (302) 252-4330
                    E-mail: fmonaco@wcsr.com
                    E-mail: mdesgrosseilliers@wcsr.com
                    E-mail: thoran@wcsr.com

-and-

Douglas S. Draper (LA Bar No. 5073)
William H. Patrick, III (LA Bar No. 10359)
Leslie A. Collins (LA Bar No. 14891)
**Heller, Draper, Hayden, Patrick & Horn, LLC**
650 Poydras Street, Suite 2500
New Orleans, Louisiana 70130-6103
Telephone: (504) 299-3300
Facsimile: (504) 299-3399
*Proposed Attorneys for the Debtors and
Debtors-in-Possession*