## EXHIBIT C

## Form of Interim Order

| | | |
|---|---|---|
| IN RE: | § | Chapter 11 |
| | § | |
| GLOBAL CAPACITY HOLDCO, LLC, | § | Case No. 10-12302 (PJW) |
| et al.[1] | § | Jointly Administered |
| | § | |
| Debtors. | § | **Re: Docket No. 22** |
| | § | |

## INTERIM ORDER GRANTING EMERGENCY MOTION FOR ORDER UNDER 11 U.S.C. §§ 105, 363, 364(c)(1) & (2), AND 364(e), FED. R. BANKR. P. 2002, 4001, AND 9014: (I) AUTHORIZING DEBTORS TO OBTAIN POSTPETITION FINANCING ON SUPERPRIORITY AND SECURED BASIS, (II) PERMITTING THE USE OF THE CASH COLLATERAL, (III) GRANTING INTERIM RELIEF, AND (IV) SCHEDULING A FINAL HEARING UNDER FED. R. BANKR. P. 4001(c)

Upon the *Emergency Motion for Order Under 11 U.S.C. §§ 105, 363, 364(c)(1) & (2),*

*and 364(e), Fed. R. Bankr. P. 2002, 4001, and 9014 (I) Authorizing Debtors To Obtain*

*Postpetition Financing On Superpriority And Secured Basis, (II) Permitting the Use of Cash*

*Collateral, (III) Granting Interim Relief, and (IV) Scheduling a Final Hearing Under Fed. R.*

*Bankr. P. 4001(c)*, dated July 23, 2010 (the "Motion")[2] filed by Global Capacity Group, Inc.,

20/20 Technologies, Inc., Capital Growth Systems, Inc., CentrePath, Inc., and Global Capacity

Direct, LLC fka Vanco Direct USA, LLC, 2020 Technologies I, LLC, NEXVU Technologies,

---

[1] The Debtors in these cases, along with their case numbers, addresses, and the last four digits of each Debtor's federal tax identification number, are: Global Capacity Holdco, LLC, 200 S. Wacker Drive, Suite 1650, Chicago, IL 60606 (10-12302) (8858); Global Capacity Group, Inc., 730 North Post Oak Road, Houston, TX 77024 (10-12303) (0073); 20/20 Technologies, Inc., 200 South Wacker, Suite 1650, Chicago, IL 60606 (10-12304) (5612); Centrepath, Inc., 275 Winter Street, Waltham, MA 02451 (10-12305) (9034); Capital Growth Systems, Inc., 200 South Wacker Drive, Suite 1650, Chicago, IL 60606 (10-12306) (3505); Global Capacity Direct, LLC (f/k/a Vanco Direct USA, LLC), 200 South Wacker Drive, Suite 1650, Chicago, IL 60606 (10-12307 (1970); FNS 2007, Inc. (fka Frontrunner Network Systems, Corp.), 200 South Wacker Drive, Suite 1650, Chicago, IL 60606 (10-12308) (7892); Nexvu Technologies, LLC, 200 South Wacker Drive, Suite 1650, Chicago, IL 60606 (10-12309) (4626); Capital Growth Acquisition, Inc., 200 South Wacker Drive, Suite 1650, Chicago, IL 60606 (10-12311) (4116); and 20/20 Technologies I, LLC, 200 South Wacker Drive, Suite 1650, Chicago, IL 60606 (10-12310) (5514).

[2] Capitalized terms used herein and not otherwise defined herein shall have the meaning ascribed to them in the DIP Agreement (as such term is defined herein), annexed hereto as Exhibit A.

{00306606-1} 1

*1010911-12*
*1027990-4*

LLC, FNS 2007, Inc. fka Frontrunner Network Systems, Corp., Capital Growth Acquisition, Inc. and Global Capacity Holdco, LLC (collectively, the "Debtors"), debtors and debtors in possession in the above-captioned cases, the Court having considered the objection filed by Pivotal GC (as such term is defined herein) (the "Pivotal GC Objection") an interim hearing (the "Interim Hearing") having been held before the Court, due and sufficient notice of the Motion and the Interim Hearing having been given; and upon the entire record made at the Interim Hearing before this court (the "Bankruptcy Court") to consider the Motion held on July 27, 2010 (the "Hearing"); and this Court having found good and sufficient cause appearing therefore;

THE DEBTORS STIPULATE AND THE COURT HEREBY FINDS, DETERMINES, AND CONCLUDES THAT:[3]

A.    Jurisdiction.   The Bankruptcy Court has core jurisdiction over the above-captioned chapter 11 case (the "Case"), the Motion, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334.  Consideration of this Motion constitutes a core proceeding as defined 28 U.S.C. §§ 157(b)(8).

B.    Notice.   Notice of the Motion and the Hearing was provided to all secured creditors, the 30 largest unsecured creditors and the United States Trustee, which constitutes due and sufficient notice thereof pursuant to Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules" 2002 and 4001(b) and (c).

C.    Petition Date.   On July 23, 2010 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, as amended (the "Bankruptcy Code").  Pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, the

---

[3] Findings of fact contained herein shall be construed as conclusions of law, and conclusions of law contained herein shall be construed as findings of fact.

1010911-12
1027990-4

Debtors continue to manage their affairs as debtors in possession. No trustee or examiner has been appointed in the Chapter 11 Cases.

D. <u>Debtors' Stipulations</u>. Without prejudice to the rights, remedies, and claims of the Committee contained in Paragraph 24 below, the Debtors acknowledge, admit, and confirm the following:

(a) Pursuant to that certain Securities Purchase Agreement, dated as of July 31, 2009, among Capital Growth Systems, Inc. and the purchasers (the "<u>July Debenture Holders</u>") from Capital Growth Systems, Inc. of variable rate secured convertible debentures of Capital Growth Systems, Inc. (the "<u>July 2009 Debentures</u>"), the July Debenture Holders agreed to extend certain loans to Capital Growth Systems, Inc. and the July Debenture Holders were issued the July 2009 Debentures. As of June 30, 2010, the outstanding indebtedness under the July 2009 Debentures totals $5,775,685, excluding unamortized OID of $1,575,187. To induce the July Debenture Holders to extend the loans evidenced by the July 2009 Debentures, (i) Capital Growth Systems, Inc. and all of its subsidiaries executed a Security Agreement (the "<u>July Security Agreement</u>"), dated as of July 31, 2009, and granted a security interest in certain property of Capital Growth Systems, Inc. and its subsidiaries to the July Debenture Holders (the "<u>July Collateral</u>"), and (ii) Global Capacity Group, Inc., 20/20 Technologies, Inc., Centerpath, Inc., Nexvu Technologies, LLC, FNS 2007, Inc., Magneta MetaLogic Ltd., and 20/20 Technologies I, LLC (collectively, the "<u>Guarantors</u>") each guaranteed the payment of such loans, pursuant to that certain Guarantee Agreement, dated as of July 31, 2009. Under the July Security Agreement, Aequitas Capital Management, Inc. was appointed as Collateral Agent for the holders of the July 2009 Debentures.

(b) Pursuant to the variable rate secured convertible debentures of Capital Growth Systems, Inc. issued on August 27, 2009 (the "<u>August 2009 Debentures</u>"), the holders (the

{00306606-1}3

1010911-12
1027990-4

"August Debenture Holders") of the August Debentures agreed to extend certain loans to Capital Growth Systems, Inc. and the August Debenture Holders were issued the August 2009 Debentures. To induce the August Debenture Holders to extend the loans evidenced by the August 2009 Debentures, Capital Growth Systems, Inc. and all of its subsidiaries granted a security interest under the July Security Agreement in certain property of Capital Growth Systems, Inc. and its subsidiaries to the August Debenture Holders (the "August Collateral"). As of June 30, 2010, the outstanding indebtedness under the August 2009 Debentures totals $2,445,892, excluding unamortized OID of $703,238.

(c)     Pursuant to that certain Securities Purchase Agreement, dated as of November 19, 2008, among Capital Growth Systems, Inc. and the purchasers (the "November Debenture Holders") from Capital Growth Systems, Inc. of variable rate secured convertible debentures of Capital Growth Systems, Inc. (the "November 2008 Debentures"), the November Debenture Holders agreed to extend certain loans to Capital Growth Systems, Inc. and the November Debenture Holders were issued the November 2008 Debentures. As of June 30, 2010, the outstanding indebtedness under the November 2008 Debentures totals $10,372,218 million, excluding unamortized OID of $4,519,032. To induce the November Debenture Holders to extend the loans evidenced by the November 2008 Debentures, (i) Capital Growth Systems, Inc. and all of its subsidiaries executed a Security Agreement (the "November Security Agreement"), dated as of November 19, 2008, and granted a security interest in certain property of Capital Growth Systems, Inc. and its subsidiaries to the November Debenture Holders (the "November Collateral"), and (ii) the Guarantors each guaranteed the payment of such loans, pursuant to that certain Guarantee Agreement, dated as of November 19, 2008. Under the November Security

1010911-12
1027990-4

Agreement, Midsummer Investment, Ltd. was appointed as Agent for the holders of the November 2008 Debentures.

(d) Pursuant to that certain Securities Purchase Agreement, dated as of March 11, 2008, among Capital Growth Systems, Inc. and the purchasers (the "March Debenture Holders") from Capital Growth Systems, Inc. of variable rate secured convertible debentures of Capital Growth Systems, Inc. (the "March 2008 Debentures"), the March Debenture Holders agreed to extend certain loans to Capital Growth Systems, Inc. and the March Debenture Holders were issued the March 2008 Debentures. As of June 30, 2010, the outstanding indebtedness under the March 2008 Debentures totals $17,967,197 million, excluding unamortized OID of $8,947,390. To induce the March Debenture Holders to extend the loans evidenced by the March 2008 Debentures, (i) Capital Growth Systems, Inc. and all of its subsidiaries executed a Security Agreement (the "March Security Agreement"), dated as of March 11, 2008, and granted a security interest in certain property of Capital Growth Systems, Inc. and its subsidiaries to the March Debenture Holders (the "March Collateral"), and (ii) the Guarantors each guaranteed the payment of such loans, pursuant to that certain Guarantee Agreement, dated as of March 11, 2008. Under the March Security Agreement, Enable Growth Partners, LP was appointed as Agent for the holders of the March 2008 Debentures.

(e) Pursuant to that certain Securities Purchase Agreement, dated as of July 31, 2009, among Capital Growth Systems, Inc. and the purchasers (the "VPP Debenture Holders", and together with the July Debenture Holders, the August Debenture Holders, the November Debenture Holders and the March Debenture Holders, the "Prepetition Debenture Lenders") from Capital Growth Systems, Inc. of variable rate secured convertible debentures of Capital Growth Systems, Inc. (the "VPP 2008 Debentures", and together with the July 2009 Debentures,

{00306606-1}5

the August 2009 Debentures, the November 2008 Debentures and the March 2008 Debentures, the "Prepetition Debentures", and the obligations thereunder the "Prepetition Debenture Obligations"), the VPP Debenture Holders agreed to extend certain loans to Capital Growth Systems, Inc. and the VPP Debenture Holders were issued the VPP 2008 Debentures. As of June 30, 2010, the outstanding indebtedness under the VPP 2008 Debentures totals $1,514,245 million, excluding unamortized OID of $476,893. To induce the VPP Debenture Holders to extend the loans evidenced by the VPP 2008 Debentures, (i) Capital Growth Systems, Inc. and all of its subsidiaries executed a Security Agreement (the "VPP Security Agreement", and together with the July Security Agreement, the November Security Agreement and the March Security Agreement, the "Prepetition Security Agreements"), dated as of July 31, 2009, and granted a security interest in certain property of Capital Growth Systems, Inc. and its subsidiaries to the VPP Debenture Holders (the "VPP Collateral", and together with the July Collateral, the August Collateral, the November Collateral and the March Collateral, the "Prepetition Collateral"), and (ii) the Guarantors each guaranteed the payment of such loans, pursuant to that certain Guarantee Agreement, dated as of July 31, 2009. Under the VPP Security Agreement, Aequitas Capital Management, Inc. was appointed as Collateral Agent for the holders of the VPP 2008 Debentures. Each of the collateral agents and agents referred to in Paragraphs (D)(a) through (D)(d) are collectively referred to herein as the "Prepetition Agents".

(f)     Pursuant to the Prepetition Security Agreements, each of the Debtors granted liens on, and irrevocable pledges and security interests in, the Collateral (as defined in the Prepetition Security Agreements) to and/or for the benefit of the Prepetition Debenture Lenders to secure the obligations under the Prepetition Debentures and any guarantees thereof (collectively, the "Prepetition Liens").

(g)     On or about November 19, 2008, the Debtors and Magenta Netlogic Limited (UK) ("Magenta") entered into that certain Term Loan and Security Agreement (as amended, collectively the "Pivotal GC Senior Loan Agreement") with ACF CGS, L.L.C., as agent for one or more lenders as the predecessor in interest to Pivotal Global Capacity, LLC ("Pivotal GC"), pursuant to which the Debtors agreed to borrow $8.5 Million (the "Pivotal GC Senior Loan"). All of the Debtors' accounts receivable, accounts, and other types of Cash Collateral as well as all or virtually all property of the Debtors' estates collateralize Pivotal GC's Senior Loan. The Pivotal GC Senior Loan Agreement and related documents (the "Pivotal GC Senior Loan Documents") provide that, *inter alia*, immediately upon the incurrence by any Debtor of any indebtedness (other than indebtedness specifically permitted under the Pivotal GC Senior Loan Documents), the Debtors must prepay the Pivotal GC Senior Loan, including the prepayment fee specified in the Pivotal GC Senior Loan Documents. The Prepetition Debenture Obligations and Prepetition Liens are junior to the liens and interests of the Pivotal GC in both payment and lien priority.

(h)     The Prepetition Debenture Lenders entered into a series of Subordination and Intercreditor Agreements with Pivotal GC ("Pivotal GC Intercreditor Agreements") which remain in full force and effect. For purposes of this Order, the parties to the Pivotal GC Intercreditor Agreements are not waiving any rights or defenses under such agreements, all of which are preserved.

(i)     As of the Petition Date, the principal amount of the Pivotal GC Senior Loan is $5,024,392.37 until and inclusive of July 31, 2010. Should the Pivotal GC Senior Loan not be repaid before August 1, 2010 then the principal amount of the Pivotal GC Senior Loan increases to $5,123,903.25 starting on and inclusive of August 1, 2010. Interest on the Pivotal GC Senior

Loan through the petition date of July 23, 2010, is $73,830.65. Interest continues to accrue at $3,210.03 per day until and inclusive of July 31, 2010. Should the Pivotal GC Senior Loan not be repaid before August 1, 2010 then interest continues to accrue at $3,273.60 per day until and inclusive of August 31, 2010. Pivotal GC is entitled to a prepayment fee in the amount of $85,000.00. Pivotal GC is also entitled to indemnification and reimbursement of its pre-bankruptcy and bankruptcy-related professional fees and costs currently estimated in the amount of $25,000.00 through the date of this Order. The total of such amounts, $5,224,273.17 as of July 28, 2010, is currently the liquidated portion of Pivotal GC's first priority secured claim (the "Pivotal GC Liquidated Claim"), and is secured by valid, perfected, first priority, enforceable liens in the Debtors' assets and, subject to section 552 of the Bankruptcy Code, all postpetition proceeds, products, offspring, rents and profits thereof.

(j)     The Pivotal GC Senior Loan Documents provide that if and to the extent that payment of any portion of the Pivotal GC Senior Loan is set aside or ordered to be disgorged, refunded or in any manner repaid (such portion of the Pivotal GC Senior Loan, the "Pivotal GC Disgorgement") that the first priority secured claim is reinstated in accordance with its terms as if the payment had not been made. The Debtors also must (1) pay all of the continuing Pivotal GC costs and expenses in connection with the administration and enforcement of the Pivotal GC Senior Loan, including reasonable professional fees, and (2) indemnify Pivotal GC for all of its liabilities, damages, losses, reasonable attorneys' fees and other costs relating in any way to the Pivotal GC Senior Loan, with the sole exception of losses for which there has been a final judicial determination that the losses resulted from the Pivotal GC's gross negligence or willful misconduct as provided in the Pivotal GC Senior Loan Documents, (such obligations described by (1) and (2) above except for the Pivotal GC Disgorgement are referred to herein as the

{00306606-1}8

"Pivotal GC Indemnification and Reimbursement Claims" (such that Pivotal GC shall not be entitled to a duplicative recovery of both the Pivotal GC Disgorgement and the same dollar amount as indemnified damages or liabilities) and, together with the Pivotal GC Liquidated Claim, collectively referred to herein as the "Pivotal GC Secured Claim"). The Pivotal GC Indemnification and Reimbursement Claims are secured by valid, perfected, enforceable liens in the Debtors' assets and, subject to section 552 of the Bankruptcy Code, all postpetition proceeds, products, offspring, rents and profits thereof, and are not subject to avoidance, recharacterization, reduction, disallowance, impairment, or subordination under the Bankruptcy Code or applicable non-bankruptcy law. The Pivotal GC Indemnification and Reimbursement Claim survives termination of the Pivotal GC Senior Loan until fully satisfied in accordance with this Order and continues to be subject to the Pivotal GC Intercreditor Agreements which remain fully in effect.

(k)     The Prepetition Liens of the Prepetition Debenture Lenders are (i) valid, binding, perfected, enforceable liens, junior only to the liens of Pivotal GC on the Prepetition Collateral and, subject to section 552 of the Bankruptcy Code, all postpetition proceeds, products, offspring, rents and profits thereof, (ii) not subject to avoidance, recharacterization, reduction, disallowance, impairment, or subordination under the Bankruptcy Code or applicable non-bankruptcy law other than with respect to the Pivotal GC Intercreditor Agreements, and (iii) subject and subordinate only to (A) the Adequate Protection Liens (as defined below), (B) the Carve-Out (as defined below and to which the Adequate Protection Liens are subject), (C) the Liens (as defined below), and (D) valid, perfected, unavoidable, allowed Pivotal GC Secured Claim. The Prepetition Debentures, Prepetition Security Agreements and related guarantees are valid and binding agreements and obligations of the Debtors.

(l)     The Prepetition Debenture Obligations constitute legal, valid, and binding obligations of the Debtors, enforceable in accordance with their terms and no objection, offset, defense, or counterclaim of any kind or nature to the Prepetition Debenture Obligations exists. The Prepetition Debenture Obligations, and any amounts previously paid to the Prepetition Debenture Lenders on account thereof or with respect thereto, are not subject to avoidance, recharacterization, reduction, disallowance, impairment, or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law. The Debtors do not have, hereby forever release, and are forever barred from bringing, any claims, counterclaims, causes of action, defenses, or setoff rights, whether arising under the Bankruptcy Code or otherwise, with respect to the Prepetition Debenture Obligations or against any of the Prepetition Debenture Lenders and their respective predecessors-in-interest, affiliates, subsidiaries, agents, officers, directors,

1010911-12
1027990-4

employees, and attorneys, with respect to the Prepetition Debenture Obligations, the Prepetition Security Agreements, the Prepetition Debentures, and related guarantees.

(m)     The Debtors admit that (1) the Pivotal GC Secured Claim should be allowed in full as a secured claim for all purposes in the Chapter 11 Cases and any subsequent cases or proceedings under the Bankruptcy Code, including, without limitation, any chapter 7 proceedings if any Chapter 11 Case is converted to a case under Chapter 7 of the Bankruptcy Code, (2) the Pivotal GC Secured Claim constitutes a legal, valid, and binding obligation of the Debtors, enforceable in accordance with the terms of the Pivotal GC Senior Loan Documents, and no objection, offset, defense, or counterclaim of any kind or nature to the Pivotal Secured Claim exists, (3) the Pivotal GC Senior Loan, and any amounts previously paid to Pivotal GC or its predecessor in interest on account thereof or with respect thereto, are not subject to avoidance, recharacterization, reduction, disallowance, impairment, or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law, and (4) the Debtors and their estates do not have any claims, counterclaims, causes of action, demands, damages, liabilities, responsibilities, disputes, remedies, obligations, defenses, or setoff or recoupment rights, of any type, including so-called "lender liability" claims or defenses, whether arising under the Bankruptcy Code or otherwise, with respect to the Pivotal GC Senior Loan or against Pivotal GC and its predecessor in interest, affiliates, subsidiaries, agents, officers, directors, employees, and attorneys, with respect to the Pivotal GC Senior Loan, the Pivotal GC Senior Loan Documents, and any and all actions and omissions relating in any way to the Pivotal GC Senior Loan, including with respect to the Debtors' bankruptcy planning and bankruptcy cases, including potential debtor in possession financing and sale and plan alternatives ("Claims Against Pivotal GC").

(n)     The Prepetition Debenture Lenders perfected their security interests and Prepetition Liens in and on the domestic Prepetition Collateral by, among other methods, the filing of UCC-1 financing statements, instruments filed in federal, state, and county offices, mortgages, and other required documents against the Debtors and such collateral with the proper federal, state, and county offices for the perfection of such security interests and Prepetition Liens.

(o)     Pivotal GC and its predecessor in interest perfected their security interests and prepetition liens in and on the domestic Prepetition Collateral by, among other methods, the filing of UCC-1 financing statements, instruments filed in federal, state, and county offices, mortgages, and other required documents against the Debtors and such Collateral with the proper federal, state, and county offices for the perfection of such security interests and prepetition liens and by possession of equity certificates.

E.     <u>Cash Collateral</u>.  For purposes of this Order, the following constitute "<u>Cash Collateral</u>" of the Prepetition Debenture Lenders and Pivotal GC to the extent set forth herein within the meaning of section 363(a) of the Bankruptcy Code: (a) all funds of the Debtors (including any funds subject to a right of setoff in favor of any Prepetition Debenture Lender, any funds on deposit or maintained in any account subject to a control agreement with any Prepetition Debenture Lender, and any proceeds of the Prepetition Collateral) as of the Petition Date, and (b) all cash proceeds of Prepetition Collateral received after the Petition Date.

F.     <u>Prepetition Debenture Lenders' Consent</u>.  The Prepetition Agents, individually and as agents for each of the Prepetition Debenture Lenders, consent to the Debtors' use of the Prepetition Debenture Lenders' Cash Collateral and the priming of the Prepetition Liens by the Liens, solely on the terms and conditions set forth in this Order, and in accordance with the

1010911-12
1027990-4

Budget. The adequate protection provided herein and other benefits and privileges contained herein are consistent with and authorized by the Bankruptcy Code and are necessary in order to obtain such consent.

G.　　Pivotal GC's Non-consent. Pivotal GC has not consented to the Debtors' use of Cash Collateral except to the extent set forth herein, and its rights and interests shall be adequately protected as provided herein.

H.　　Findings Regarding the Use of Cash Collateral. (a) Good cause has been shown for the entry of this Interim Order. The Debtors have an immediate and critical need to use the Cash Collateral in order to continue to operate their businesses, and effectuate a reorganization of their businesses. The Debtors' use of Cash Collateral has been deemed sufficient to meet the Debtors' immediate postpetition liquidity needs, subject to the terms of this Order, and all other agreements, documents, notes, or instruments delivered pursuant hereto or thereto or in connection herewith or therewith, including, without limitation, the Budget.

(a)　　The ability of the Debtors to have sufficient available sources of working capital to continue their businesses, effectuate a reorganization of their businesses, and maximize the value of their assets depends upon the Debtors' use of Cash Collateral. The Debtors have requested that the Prepetition Debenture Lenders, through their respective agents, consent to (i) the use of their Cash Collateral, to be used by the Debtors solely in accordance with the terms of this Order and the Budget, and (ii) the priming of their liens on the Prepetition Collateral solely to the extent provided herein. The Prepetition Debenture Lenders are willing to provide such financial accommodations on a superpriority and secured basis, as more particularly described herein.

{00306606-1}13

(b)     Pivotal GC's objection to the Debtors' use of Cash Collateral is resolved by (1) allowance of the Pivotal GC Secured Claim after the Pivotal GC Objection Deadline, (2) full payment of the Pivotal GC Liquidated Claim, in cash, from the first DIP Loan proceeds, which is indefeasible after the Pivotal GC Objection Deadline, (3) the admissions of the Debtors with respect to the waivers and releases of the Claims Against Pivotal GC, (4) the Adequate Protection provided herein for the Pivotal GC Disgorgement (5) the waivers and releases effective after the Pivotal GC Objection Deadline, (6) the continued effectiveness of the Pivotal GC Intercreditor Agreements, and (7) the allowance and treatment of the Pivotal GC Indemnification and Reimbursement Claims reduced by the Pivotal GC Liquidated Claim Payment  and increased thereafter by all subsequent Pivotal GC Indemnification and Reimbursement Claims ("Pivotal GC Remaining Claim") in this Order, with continued first lien priority and superpriority administrative claim status for the Pivotal GC Remaining Claim, and a replacement lien in postpetition assets to the extent that the Pivotal G C Secured Claim was a valid and perfected secured claim.  For the avoidance of any ambiguity, the DIP Lien does not prime and does not have priority over Pivotal GC's security interest with respect to the Pivotal GC Remaining Claim to the extent the Pivotal G C Secured Claim is valid and perfected.

(c)     Based on the record presented to the Court at the Interim Hearing, good, adequate and sufficient cause has been shown to justify the immediate grant of the relief requested in the Motion, as modified by this Order, to avoid irreparable harm to the Debtors' estates. The terms of the Debtors' use of the Cash Collateral, as more fully set forth herein, are (i) fair and reasonable, (ii) reflect the Debtors' prudent exercise of business judgment consistent with their fiduciary duties, (iii) constitute reasonably equivalent value and fair consideration for the Prepetition Debenture Lenders consent thereto, and (iv) are essential and appropriate for the

continued operation and management of the Debtors' businesses and the preservation of their assets and properties. Entry of this Order is in the best interests of the Debtors' estates and all parties in interest in these Chapter 11 Cases.

I.    Necessity for Post-Petition Financing.

(a)    Good cause has been shown for the entry of this Order.

(b)    The Debtors have an immediate need to obtain post-petition financing to avoid irreparable harm. Obtaining post-petition financing is in the best interests of the Debtors' estates.

(c)    The Debtors are unable to obtain (i) adequate unsecured credit allowable under sections 503(b)(1) or 364(c)(1) of the Bankruptcy Code, as an administrative expense or (ii) secured credit allowable only under sections 364(c)(2) or 364(c)(3) of the Bankruptcy Code, without the Debtors granting to the DIP Lenders (as defined below) the Super-Priority Claim (as defined below) and the Liens (as defined below).

J.    Reasonable Terms; Good Faith.

(a)    The terms of the proposed post-petition financing (the "Post-Petition Financing") and use of Cash Collateral, as modified by this Order, are fair and reasonable, are supported by reasonably equivalent value and fair consideration, and reflect the Debtors' exercise of prudent business judgment consistent with its fiduciary duties.

(b)    The Post-Petition Financing and the terms of use of the Cash Collateral has been negotiated in good faith and at arm's-length among the Debtors, the Lenders and the Prepetition Debenture Lenders.

(c)    All of the Debtors' indebtedness and other obligations to the Lenders set forth in the DIP Agreement (as defined below) (the "DIP Lenders") arising under, in respect of

or in connection with (i) the Debtor in Possession Loan and Security Agreement (the "DIP Agreement") and all related guaranty, security and other agreements, documents, notes and instruments together with all exhibits, schedules, annexes and appendices thereto, delivered pursuant hereto or thereto, or in connection herewith or therewith, (collectively, with the DIP Agreement, the "DIP Loan Documents"); and (ii) this Order (collectively, the "DIP Obligations") shall be deemed to have been extended by the Lenders in good faith, as that term is used in section 364(e) of the Bankruptcy Code.

K. Protections of Section 364(e) of the Bankruptcy Code. All of the credit extended postpetition by the DIP Lenders pursuant to the DIP Loan Documents (including all the DIP Obligations) after entry of this Order was extended by the DIP Lenders in good faith and in express reliance upon the protections afforded to post-petition lenders pursuant to section 364(e) of the Bankruptcy Code and, accordingly, all of the DIP Obligations shall be entitled to the full protections of section 364(e) of the Bankruptcy Code in the event this Order or any provision hereof is vacated, reversed or modified (including pursuant to a final order on the Motion (the "Final Order") entered after a final hearing on the Motion (the "Final Hearing"), whether on appeal or otherwise and upon execution and delivery of the DIP Loan Documents, the DIP Loan Documents as modified by this Order shall constitute valid and binding obligations of the Debtors, enforceable against the Debtors in accordance with the terms of the DIP Loan Documents, this Order, and section 364(e) of the Bankruptcy Code.

The Prepetition Agents, individually and as agents for each of the Prepetition Debenture Lenders, are permitting the use of their Cash Collateral and the priming of their Prepetition Liens in good faith and in express reliance upon the protections afforded to post-petition lenders pursuant to section 364(e) of the Bankruptcy Code, and, accordingly, shall be entitled to the full

protections of section 364(e) of the Bankruptcy Code in the event this Order or any provision hereof is vacated, reversed or modified (including pursuant to a Final Order on the Motion entered after a Final Hearing on the Motion).

IT IS HEREBY ORDERED, ADJUDGED AND DECREED EFFECTIVE IMMEDIATELY, AND AGREED AMONG THE PARTIES THAT:

1.      Authorization to use Cash Collateral. Subject to the terms and conditions set forth in this Order and the DIP Loan Documents as modified by this Order, including, without limitation, the Adequate Protection Obligations and the Adequate Protection Liens and treatment of the Pivotal GC Secured Claim provided herein, upon entry of this Order, the Debtors are authorized, pursuant to section 363(c)(2)(B) of the Bankruptcy Code, to use the Cash Collateral solely and exclusively for the disbursements set forth in the Budget for the period of time from the date hereof until the earliest to occur of (a) the date that this Order or the Final Order (when applicable) ceases to be in full force and effect or (b) the occurrence of the Termination Date as set forth in this Order, at which time all accrued interest and fees and all other Adequate Protection Obligations shall, in each instance, be immediately due and payable and the Prepetition Debenture Lenders and Pivotal GC shall have all other rights and remedies provided in this Order and under applicable law and the Debtors' authority to use the Cash Collateral shall automatically terminate without further order or relief from the Court. Notwithstanding anything herein to the contrary, all of the rights, remedies, benefits, and protections provided to the Prepetition Debenture Lenders and Pivotal GC under this Order shall survive the Termination Date and shall be effectuated whether or not set forth in the Budget.

2.      As Adequate Protection for the Pivotal GC Disgorgement in the event Pivotal GC disgorges, refunds or in any manner repays to the Debtors or their estates, the Pivotal GC

Disgorgement shall be placed in a segregated interest bearing account, opened prior to any disgorgement by Pivotal GC with a control account agreement in place for the benefit of Pivotal GC ("Pivotal GC Account"). Pivotal GC may assert a claim against the funds in the Pivotal GC Account on any ground, including as a Pivotal GC Indemnification and Reimbursement Claim. The Pivotal GC Account shall be subject to a valid and perfected security interest in favor of Pivotal GC that shall not be subject to any priming or other lien, claim, surcharge (equitable or legal) or Claims Against Pivotal GC of any type by any trustee or other party to the extent the Pivotal GC Liquidated Claim was a valid and perfected secured claim. In the event that Pivotal GC's right to the Pivotal GC Disgorgement is adjudicated in favor of Pivotal GC, all funds in the Pivotal GC Account including all interest shall be paid to Pivotal GC without further order of this Court. If Pivotal GC is adjudicated by final order with no right of appeal to have no rights or claims to the funds in the Pivotal GC Account, the Pivotal GC Account shall be paid to the DIP Lenders as a permanent paydown of the DIP Loan.

3.  **Use of Cash Collateral.** Subject to the terms and conditions of this Order, the Prepetition Agents, individually and as agents for each of the Prepetition Debenture Lenders, are willing to consent to the use of Cash Collateral in accordance with the Budget. No Cash Collateral shall be utilized for the payment of professional fees, disbursements, costs or expenses incurred in connection with asserting any claims or causes of action against the Prepetition Debenture Lenders or the Lenders or Pivotal GC and/or challenging or raising any defenses to the Senior Loan, the DIP Obligations, the Adequate Protection Obligations or the Prepetition Liens, the advances or other obligations under the Senior Loan, Post-Petition Facility or the liens or security interests of Pivotal GC, the Prepetition Debenture Lenders or the DIP Lenders; provided, however, the Creditors' Committee may use up to $25,000 to conduct the investigation

{00306606-1}18

set forth in this Order. The Debtors shall pay the Pivotal GC Indemnification and Reimbursement Claim invoices within five (5) business days of completion of the billing review process set forth in paragraph 28 of this Order.

4. The Pivotal GC Liquidated Claim shall be paid within two (2) business days of the funding of the DIP Loan. The Creditors Committee shall file any objection or challenge it may assert to the Pivotal GC Liquidated Claim, the Pivotal GC Remaining Claim or any aspect of the Pivotal GC Secured Claim upon its investigation pursuant to paragraph 5 hereof by August 13, 2010 or such date as may be set forth in the Final Order (the "Pivotal GC Objection Deadline"). If no challenge or objection is made to the Pivotal GC Secured Claim before the Pivotal GC Objection Deadline, including as to the reasonableness of Pivotal GC's professional fees and expenses, or payment of the Pivotal GC Liquidated Claim or the Pivotal GC Remaining Claim, (1) Pivotal GC's Secured Claim shall be deemed finally allowed and not subject to modification or reconsideration under section 502(j) of the Bankruptcy Code or otherwise, (2) neither the Pivotal GC Liquidated Claim Payment nor any payments to Pivotal GC for the Pivotal GC Indemnification and Reimbursement Claim shall be subject to clawback or recovery by the Debtors, their bankruptcy estates or any party in interest on any grounds, and such payment shall be indefeasible, and (3) the Debtors, their bankruptcy estates, and all parties with rights and interests derived through or on behalf of them, including any successor trustee or receiver, shall be finally and irrevocably deemed to have released and waived Claims Against Pivotal GC. The Debtors shall pay the reasonable costs and expenses incurred by Pivotal GC as of the Pivotal GC Objection Deadline if no challenge or objection is made by that date and whereupon the Pivotal GC Remaining Claim shall be deemed indefeasibly paid in full.

1010911-12
1027990-4

5. If a challenge or objection is made to any portion of the Pivotal GC Secured Claim before the Pivotal GC Objection Deadline, any and all claims and defenses related to the Pivotal GC Secured Claim shall be deemed, immediately and without further action, to have been forever relinquished, released, and waived, except with respect to claims and defenses that are expressly asserted in such challenge or objection, unless such claims in accordance with the Federal Rules of Civil Procedure relate back to the date the complaint was filed. In the event such a challenge is made to any aspect of the Pivotal GC Secured Claim before the Pivotal GC Objection Deadline, then Pivotal GC's first priority liens shall remain unprimed in full force and effect to secure the Pivotal GC Remaining Claim until all Claims Against Pivotal GC are resolved by final Court order, not subject to appeal and the Pivotal GC Remaining Claim is paid thereafter to the extent allowed by the Bankruptcy Court. The Court retains jurisdiction to adjudicate any disputes concerning the Pivotal GC Secured Claim. For the avoidance of ambiguity, the liens granted to Pivotal GC under this Order and the adequate protection granted herein are not valid, perfected or enforceable to the extent Pivotal GC's pre-petition security interests are not or were not found to be valid, perfected or enforceable.

6. <u>Adequate Protection Obligations</u>. The Prepetition Debenture Lenders and Pivotal GC are entitled, under sections 363(e) and 364(d)(1)(B) of the Bankruptcy Code, to adequate protection of their interest in the Prepetition Collateral, including the Cash Collateral, for and equal in amount to the amount of the aggregate diminution in the value of the Prepetition Debenture Lenders' and Pivotal GC's interests in the Prepetition Collateral, including any such diminution resulting from (a) the use of Cash Collateral, (b) the sale, lease, or use by the Debtors (or other decline in value) of the Prepetition Collateral, and (c) the imposition of the automatic stay under section 362 of the Bankruptcy Code (the aggregate amount of such diminution, which

shall expressly include, among other things, the aggregate amount of the Cash Collateral used by the Debtors from and after the Petition Date, the "Adequate Protection Obligations"). The Debtors shall each be jointly and severally liable for the Adequate Protection Obligations.

7.    Authorization to Enter into DIP Loan Documents and Incur DIP Obligations.

(a)    The Debtors are hereby authorized, on an interim basis, to enter into the DIP Loan Documents as modified by this Order and borrow monies pursuant to the DIP Loan Agreement up to an aggregate principal amount of nine million two hundred and fifty thousand dollars ($9,250,000) in accordance with the terms of this Order and the DIP Loan Documents as modified by this Order. Such funds shall only be used for purposes permitted or prescribed under the DIP Loan Documents as modified by this Order including, without limitation, only as provided and limited by the Budget, this Order and the DIP Loan Documents.

(b)    In no event shall an individual DIP Lender be required to fund in excess of such Lender's respective tranche amount set forth in the DIP Loan Documents. In no event shall the Prepetition Agents be required to fund in excess of their respective tranche amount set forth in the DIP Loan Documents.

(c)    The Debtors are expressly authorized and directed to do and perform all acts and to make, execute and deliver all instruments and documents as may be reasonably required by the DIP Loan Documents as modified by this Order (including, without limitation, the execution or recordation of security agreements, control agreements, mortgages and financing statements).

(d)    The Debtors are authorized to execute and deliver amendments to the DIP Loan Documents as may be agreed by the parties thereto except for (i) any increase in the DIP Obligations, (ii) any increase in the applicable interest rates, (iii) any modification of the

{00306606-1}21

maturity of the DIP Loan Documents, or (iv) any modification of the rights of Pivotal GC to the extent set forth herein. Any such amendment shall become effective five (5) days after copies of all such amendments are filed with the Court and served upon the counsel to the United States Trustee, the official committee of unsecured creditors, if any, retained pursuant to sections 327 or 1103(a) of the Bankruptcy Code (the "Committee") and all persons who properly filed notices of appearances and requests for service pursuant to Bankruptcy Rule 2002.

8.      Conditions to Lending. The DIP Lenders' obligation to fund any of the Post-Petition Financing is conditioned upon and subject to execution of final, definitive DIP Loan Documents, including the DIP Agreement, each in a form acceptable to the DIP Lenders in their sole discretion, substantially in the form filed with the Court as modified by this Order. Subject to the terms and conditions of the DIP Agreement as modified by this Order, on an interim basis, the Tranche A Lender shall fund the Tranche A initial Advance of $3,000,000 and the Tranche B Lenders shall fund the Tranche B initial Advance of up to $6,250,000 simultaneously, which Tranche A and Tranche B initial Advances have been placed in escrow. Thereafter, subject to the terms and conditions of the DIP Agreement as modified by this Order and a Final Order consistent with the terms of this Order with respect to Pivotal GC, additional Advances by the Tranche B Lenders shall be made in the aggregate amount of $1,000,000 in accordance with the Budget.

9.      Super-Priority Claims.

(a)      For all of the DIP Obligations, the DIP Lenders are hereby granted pursuant to section 364(c)(1) of the Bankruptcy Code an allowed superpriority administrative expense claim (which allowed superpriority claim shall be payable from and have recourse to all pre-petition and post-petition property of the Debtors' estates and the proceeds thereof), but excluding

{00306606-1}22

recoveries of avoidance actions under sections 544, 545, 547, 548, 550, 551 or 553 of the Bankruptcy Code (the "Avoidance Action Recoveries") as set forth herein with priority over any and all administrative expenses, claims for adequate protection, and all other claims against the Debtors, now existing or hereafter arising, except for the Pivotal GC Remaining Claim and any rights Pivotal GC has with respect to the funds in the Pivotal GC Account (whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment), including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) (if any) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 365, 502(b), 506(c), 507(a), 546, 726, 1113 and 1114 of the Bankruptcy Code (collectively, the "Superpriority Claim"), subject only to payment of the Carve-Out (as defined herein) and Pivotal GC Remaining Claim. Notwithstanding anything to the contrary contained in this Order, the Superpriority Claim shall not be used as a basis to recover any payments made in these cases pursuant to the Budget (including any variances to the Budget that are authorized by the Lenders in accordance with the terms of the DIP Agreement) in the ordinary course of business or this Order or any payments to Pivotal PC.

(b)     The Prepetition Debenture Lenders and Pivotal GC are hereby granted in each of the Debtors' Chapter 11 Cases an allowed, superpriority administrative expense claim (the "Cash Collateral Superpriority Claim") under section 507(b) of the Bankruptcy Code with respect to all Adequate Protection Obligations but excluding Avoidance Action Recoveries and amounts paid to Pivotal GC pursuant to this Order. The Cash Collateral Superpriority Claim shall have priority over all administrative expenses of the kind specified in, or ordered pursuant to, any provision of the Bankruptcy Code, including, without limitation, those specified in, or ordered

pursuant to, sections 105, 326, 328, 330, 503(b), 506(c), 507(a), 507(b), 546(c), 726, and 1114 of the Bankruptcy Code, or otherwise (whether incurred in any of the Chapter 11 Cases or any conversion thereof to a case under chapter 7 of the Bankruptcy Code or any other proceeding related hereto or thereto), which Cash Collateral Superpriority Claims shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof. The Cash Collateral Superpriority Claim shall be subject and subordinate only to the Superpriority Claim and the Carve-Out and the Pivotal GC Remaining Claim. and any rights Pivotal GC has with respect to the funds in the Pivotal GC Account. Notwithstanding anything to the contrary contained in this Order, the Cash Collateral Superpriority Claim shall not be used as a basis to recover any payments made in these cases pursuant to the Budget (including any variances to the Budget that are authorized by the Lenders in accordance with the terms of the DIP Agreement) in the ordinary course of business or pursuant to this Order.

10.    Liens.    (a) In accordance with Section 364(c)(1) of the Bankruptcy Code, as security for the DIP Obligations, deemed effective and perfected as of the Petition Date and without the necessity of the Debtors incurring the expense for the execution, recordation of filings of mortgages, security agreements, control agreements, pledge agreements, financing statements or other similar documents, or possession or control of applicable assets, the DIP Lenders shall be granted a valid, perfected, priming, first-priority senior security interest in and liens on all of the Debtors' and the Debtor's affiliate Magenta's now owned and hereafter acquired, created or arising Collateral (as defined below) subject only to the payment of the Carve-Out, but excluding Avoidance Action Recoveries, and Pivotal GC Remaining Claim which remain secured by the Pivotal GC first priority security interest in the collateral of the Debtors and the stock of Magenta to the extent provided herein (all such liens and security

interests granted to the Lenders, pursuant to this Order and the DIP Loan Documents, the "Liens"). For purposes hereof, "Collateral" is defined as all assets and property of the Debtors and their estates, including without limitation all present and future accounts, deposit accounts, chattel paper, equipment, documents, general intangibles, held items, investment property, instruments, inventory, items of payment, proceeds, products, records and all other Collateral set forth in the DIP Loan Agreement. The Liens shall extend and attach to all Collateral and any proceeds of Collateral which is presently in existence or hereafter acquired (whether acquired prior to or subsequent to the Petition Date) and which is owned by the Debtors or in which Debtors have any interest, whether held by any of Debtors or by others for any of Debtors' account, wherever located.

(b)    To secure the Adequate Protection Obligations, deemed effective and perfected as of the Petition Date and without the necessity of the Debtors incurring the expense for the execution, recordation of filings of mortgages, security agreements, control agreements, pledge agreements, financing statements or other similar documents, or possession or control of applicable assets, the Prepetition Debenture Lenders shall be granted a valid, perfected, priming, security interest in and liens on all of the Debtors' and the Debtor's affiliate Magenta's now owned and hereafter acquired, created or arising Collateral , but excluding Avoidance Action Recoveries, subject only to Liens, the Carve-Out and the Pivotal GC Remaining Claim and Pivotal GC Disgorgement (all such liens and security interests granted to the Prepetition Debenture Lenders pursuant to this Order, the "Adequate Protection Liens"). The Adequate Protection Liens shall extend and attach to all Collateral and any proceeds of Collateral which is presently in existence or hereafter acquired (whether acquired prior to or subsequent to the Petition Date) and which is owned by the Debtors or in which Debtors have any interest, whether

held by any of Debtors or by others for any of Debtors' account, wherever located, to the same extent as the Liens.

11.     Inter-Lender Subordination.  Notwithstanding anything set forth in this Order to the contrary, all obligations due and owing to the Tranche B Lenders, liens granted in the Collateral and Super-Priority Claim granted with respect to the Tranche B portion of the Post-Petition Financing shall be subordinate in priority and payment to all obligations due and owing to the Tranche A Lender, liens granted in the Collateral and Super-Priority Claim granted with respect to Tranche A portion of the Post-Petition Financing.

12.     Automatic Stay; Remedies.

(a)     Upon the occurrence of an Event of Default under the DIP Loan Documents, all stays and injunctions in this Case, including, but not limited to, the automatic stay arising under section 362(a) of the Bankruptcy Code will be terminated automatically and irrevocably as to the Lenders and the Prepetition Debenture Lenders thereby permitting the DIP Lenders and the Prepetition Debenture Lenders, as applicable, *inter alia*, to enforce their remedies against the Collateral (subject to the rights of Pivotal GC as set forth in this Order), without further order of the Bankruptcy Court and without the need for filing any motion for relief from the automatic stay or any other pleading in order to:

(i)     Declare the Loan to be terminated, whereupon the same shall forthwith terminate;

(ii)    Declare the Obligations to be forthwith due and payable, whereupon all Obligations shall become and be forthwith due and payable, without presentment, notice of dishonor, protest or further notice of any kind, all of which the Borrowers hereby expressly waive;

(iii)   Declare the Debtors' right to use Cash Collateral to be terminated, where upon the same shall forthwith terminate, provided that, (i) with the written agreement of the DIP Lenders or (ii) pursuant to

{00306606-1}26

an order of the Court upon emergency motion and upon no less than three (3) full business days' notice to the DIP Lenders and Pivotal GC (which may be filed by Borrowers or the Committee), the Debtors may use only that amount of Cash Collateral necessary to preserve and protect the Collateral, which may include ongoing operations for a period not to exceed thirty (30) days or such additional period of time to which Lenders agree in their sole discretion; and

(iv)     Charge the default rate of interest on all Obligations.

(b)     Notwithstanding anything herein to the contrary, and notwithstanding the applicability of section 362 of the Bankruptcy Code (to the extent necessary to exercise such remedies, relief from automatic stay shall be deemed granted), upon notice of breach to the Debtors and the Debtors' failure to cure any such breach after three (3) business days of receipt of such notice, the DIP Lenders and the Prepetition Debenture Lenders shall also be entitled to immediately exercise any of the following rights and remedies (subject to the rights of Pivotal GC as set forth in this Order), without further order of the Bankruptcy Court and without the need for filing any motion for relief from the automatic stay or any other pleading in order:

(i)     DIP Lenders may apply any and all money owing by the DIP Lenders to the Borrowers to the payment of the Obligations, in the DIP Lenders' sole discretion, subject to and in accordance with Section 9.5 hereof and subject to the Carve-Out and the Pivotal GC Remaining Claim;

(ii)     The DIP Lenders may exercise and enforce any and all rights and remedies available upon default to a secured party under the UCC, including the right to take possession of Collateral, or any evidence thereof, proceeding without judicial process or by judicial process, and the right to sell, lease or otherwise dispose of any or all of the Collateral (with or without giving any warranties as to the Collateral, title to the Collateral or similar warranties), and, in connection therewith, the Borrowers will on demand assemble the Collateral and make it available to the DIP Lenders at a place to be designated by the DIP Lenders which is reasonably convenient to all parties;

{00306606-1}27

(iii)    The DIP Lenders may exercise and enforce their rights and remedies under the DIP Loan Documents;

(iv)    The DIP Lenders may without regard to any waste, adequacy of the security or solvency of the Borrowers, apply for the appointment of a receiver of the Collateral, to which appointment the Borrowers hereby consent, whether or not foreclosure proceedings have been commenced under the DIP Loan Documents and whether or not a foreclosure sale has occurred;

(v)    The DIP Lenders may exercise any other rights and remedies available to them by law or agreement; and/or

(vi)    If the DIP Lenders sell any of the Collateral on credit, the DIP Obligations will be reduced only to the extent of payments actually received. If the purchaser fails to pay for the Collateral, the DIP Lenders may resell the Collateral and shall apply any proceeds actually received to the DIP Obligations.

(c)    The automatic stay imposed by section 362 of the Bankruptcy is hereby modified to the extent necessary to permit or effectuate the terms of the DIP Facility Order and the documents evidencing the DIP Facility, including, without limitation, to permit the execution and recordation of documents in the DIP Lenders' and Prepetition Debenture Lenders', as applicable, discretion to evidence the creation and perfection of the Lenders' and Prepetition Debenture Lenders' liens on the Collateral; provided, however, that nothing herein shall prevent the Debtors, the United States Trustee, Pivotal GC or the Creditors' Committee from seeking an emergency hearing to determine whether an event of default has occurred.

13.    Use of Proceeds; Bank Accounts.

(a)    The Debtors shall use the proceeds of the loans obtained under the DIP Loan Documents solely in accordance with and subject to the conditions set forth in this Order, the DIP Loan Documents as modified by this Order and the continued effectiveness of the Pivotal GC Intercreditor Agreements, and the Budget. Nothing in this Order shall be construed to require the Lenders to make advances or extensions of credit or other financial

accommodations to permit the Debtors to make any payments, except to the extent expressly provided for in this Order and the DIP Loan Documents as modified by this Order.

(b) Any proceeds of the sale, lease or other disposition of the Collateral shall be used in accordance with the provisions of this Order and the DIP Loan Documents as modified by this Order and the continued effectiveness of the Pivotal GC Intercreditor Agreements. To the extent they are applied to reduce the DIP Obligations, they shall be applied in payment of the Debtors' obligations under, and in the manner provided in, the DIP Loan Documents as modified by this Order, and the Debtors are deemed to have irrevocably waived any right to direct the manner of application of any payments to the DIP Lenders or any other receipts by the Lender of proceeds of any of the Collateral, including all of the DIP Lenders' cash collateral, other than as expressly set forth in this Order and the DIP Loan Documents.

14.    Perfection of Liens and Replacement Liens.

(a) Subject to full and indefeasible payment of the Pivotal GC Secured Claim, this Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of the Liens, without the necessity of filing or recording any financing statement or other instrument or document which may otherwise be required under the law of any jurisdiction or the taking of any other action to validate or perfect such liens or security interests in the Collateral or to entitle the DIP Lenders and the Prepetition Debenture Lenders to the priorities granted herein. The automatic stay imposed by Section 362 is modified to permit the DIP Lenders and the Prepetition Debenture Lenders, but not require the DIP Lenders or the Prepetition Debenture Lenders, to file or record financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments in any jurisdiction, or take possession or control of collateral, or take any other action in order to validate and perfect the liens and security interests

granted to it hereunder. Whether or not the DIP Lenders or the Prepetition Debenture Lenders shall, in their sole discretion, choose to file such financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments, or take possession or control of collateral, or otherwise confirm perfection of the liens and security interests granted to it hereunder, such liens and security interests shall be deemed valid, perfected, allowed, enforceable, non-avoidable and not subject to challenge, dispute or subordination, at the time and on the date of entry of this Order. Upon the request of the DIP Lenders or the Prepetition Debenture Lenders, the Debtors, without any further consent of any party or further order of this Bankruptcy Court, are authorized to take, execute and deliver such instruments and agreements (including, without limitation, delivery of control agreements and possessory collateral) to enable the DIP Lenders and the Prepetition Debenture Lenders to further validate, perfect, preserve and enforce the Liens and Adequate Protection Liens.

(b) A certified copy of this Order may, in the discretion of the DIP Lenders or the Prepetition Debenture Lenders, be filed with or recorded in filing or recording offices in addition to or in lieu of any financing statements, mortgages, notices of lien or similar instruments, and all filing offices are hereby authorized to accept such certified copy of this Order for filing and recording.

15. <u>Preservation of Rights Granted Under This Order</u>.

(a) Other than the Carve-Out and Pivotal GC Remaining Claim and Pivotal GC Disgorgement and the continued effectiveness of the Pivotal GC Intercreditor Agreements, and with respect to the Adequate Protection Liens and the Liens, no claim or lien having a priority superior to or *pari passu* with those granted by this Order to the DIP Lenders or the Prepetition Debenture Lenders shall be granted or allowed while any portion of the DIP

Obligations remains outstanding, and the Liens and the Adequate Protection Liens shall not be subordinated to or made *pari passu* with any other lien or security interest, whether under section 364(d) of the Bankruptcy Code or otherwise.

(b)     Unless all the DIP Obligations shall have been indefeasibly paid in full, the Debtors shall not, and shall not seek to, (i) in any way prime or otherwise adversely affect the liens granted under this Order by offering a subsequent lender or a party in interest a superior or *pari passu* lien or claim pursuant to sections 364(c)(1), 364(d) or section 507(b) of the Bankruptcy Code or otherwise, (ii) in any way grant junior encumbrances on any Collateral, or (iii) otherwise encumber otherwise unencumbered assets or estate property of the Debtors.

(c)     Unless all the DIP Obligations shall have been indefeasibly paid in full, the Debtors shall not seek, and it shall constitute an Event of Default if the Debtors seek, or if there are entered, any modifications or extensions of this Order without the prior written consent of the DIP Lenders, and no such consent shall be implied by any other action, inaction or acquiescence by the DIP Lenders.

(d)     If any or all of the provisions of this Order are hereafter reversed, modified, vacated or stayed, such reversal, stay, modification or vacation shall not affect (i) the validity of any of the DIP Obligations or Adequate Protection Obligations incurred or payments made or the Pivotal GC Secured Claim and treatment thereof prior to the actual receipt of written notice of the effective date of such reversal, stay, modification or vacation or (ii) the validity or enforceability of any lien or priority authorized or created hereby or pursuant to the DIP Loan Agreement with respect to any of the DIP Obligations. Notwithstanding any such reversal, stay, modification or vacation, any use of the Post-Petition Financing, Adequate Protection Obligations or other DIP Obligations by the Debtors prior to the actual receipt of written notice

{00306606-1}31

of the effective date of such reversal, stay, modification or vacation shall be governed in all respects by the original provisions of this Order, and the DIP Lenders and the Prepetition Debenture Lenders shall be entitled to all the rights, remedies, privileges and benefits granted by section 364(e) of the Bankruptcy Code, this Order and pursuant to the DIP Loan Documents with respect to all DIP Obligations and Adequate Protection Obligations.

(e)     Except as expressly provided in this Order or in the DIP Loan Documents or as agreed in writing by the DIP Lenders or the Prepetition Debenture Lenders, the Liens, the Adequate Protection Liens, the Super-Priority Claim, the Cash Collateral Super-Priority Claim and all other rights and remedies of any of the Lenders and the Prepetition Debenture Lenders granted by the provisions of this Order and the DIP Loan Documents as modified by this Order shall survive, and shall not be modified, impaired or discharged by (i) the conversion of the Chapter 11 Cases, (ii) the dismissal of any of the Chapter 11 Cases, or (iii) the entry of an order confirming a chapter 11 plan in the Case. The terms and provisions of this Order and the DIP Loan Documents as modified by this Order shall continue in the Chapter 11 Cases, in any successor cases if any of the Chapter 11 Cases cease to be jointly administered, or in any superseding chapter 7 cases under the Bankruptcy Code, and the Liens, the Adequate Protection Liens, the Super-Priority Claim, Cash Collateral Super-Priority Claim and all other rights and remedies of the DIP Lenders and the Prepetition Debenture Lenders granted by the provisions of this Order and the DIP Loan Documents shall continue in full force and effect until the DIP Obligations are indefeasibly paid in full. The rights of Pivotal GC under this Order and the Pivotal GC Senior Loan Documents and Pivotal GC Intercreditor Agreements shall likewise continue in full force and effect until the Pivotal GC Liquidated Claim and the Pivotal GC

Remaining Claim, is indefeasibly paid in full, and shall not be modified, impaired or discharged by any subsequent events in the Chapter 11 Cases or any superseding chapter 7 cases.

16.    <u>Limitation on Use of Financing Proceeds and Collateral</u>.  Notwithstanding anything herein or in any other order of the Bankruptcy Court to the contrary, no borrowings under the DIP Loan Documents, and none of the Collateral (including cash and cash equivalents and cash collateral) or the Carve-Out, may be used to (i) object, contest or raise any defense to, the validity, perfection, priority, extent or enforceability of any amount due under the DIP Agreement and the Loan Documents or Pivotal GC Senior Loan Documents or the liens or claims granted under the Financing Orders, <u>provided, however</u>, that the Creditors' Committee may object to the Final DIP Order or Pivotal GC Senior Loan Documents, (ii) object, contest or raise any defenses to, the validity, priority, extent or enforceability or any amount due with respect to the Pre-Petition Debenture Agreements or related documents, or the Pivotal GC Senior Loan Documents, (iii) assert any claims, counterclaims, defenses, causes of action, objections or contests (including, without limitation, any claims or causes of action arising under chapter 5 of the Bankruptcy Code) against the DIP Lenders, the Pre-Petition Debenture Lenders, Pivotal GC or their respective agents, affiliates, representatives, attorneys or advisors, arising out of the Pre-Petition Debenture Agreements or the DIP Agreement, <u>provided, however</u>, the Creditors' Committee may use up to $25,000 to conduct the investigation set forth in paragraph 24 hereof, or investigate the Pivotal GC Senior Loan Documents, or (iv) seek to modify any of the rights granted to the DIP Lenders under the DIP Agreement, the Loan Documents, the Pre-Petition Debenture Agreements or any related documents or any rights granted to Pivotal GC under the Pivotal GC Senior Loan Documents and Intercreditor Agreements.

*1010911-12*
*1027990-4*

17.    Termination.  The agreement by the DIP Lenders to make any post-petition financing available to the Debtors under the DIP Loan Documents as modified by this Agreement and to allow the use of cash collateral pursuant to the terms of this Order shall continue until the earlier of (i) the conclusion of the Final Hearing, (ii) August 14, 2010, if the Final Order has not been entered by that date, (iii) the date 125 days after the Petition Date, which may be extended solely at the option of the DIP Lenders and the Debtors in writing, without the need for any further Court approval or as otherwise set forth in the DIP Loan Documents, (vi) the date of the acceleration of any outstanding extensions of credit under the DIP Loan Documents, or (vii) the occurrence of an Event of Default under the DIP Loan Documents (hereinafter, the "Termination Date").  As used herein, an "Event of Default" under the DIP Loan Documents shall occur upon the occurrence of any of the following events, with no cure period, without the prior written consent of the DIP Lenders:

(a)    Default in the payment of any amount owed by the Borrowers to the DIP Lenders as and when due hereunder;

(b)    The rendering against the Borrowers of an arbitration award, a final judgment, decree or order, in each case requiring the payment of money in excess of $25,000 in the aggregate or a postpetition lien on any of the Collateral, and the continuance of such arbitration award, judgment, decree or order unsatisfied and in effect for any period of 30 consecutive days, provided however that this Paragraph 14(b) shall not apply to unsecured claims;

(c)    The filing by any of the Borrowers of any motion or proceeding that could reasonably be expected to result in material impairment of the DIP Lenders' rights under the DIP Agreement as modified by this Order, including any motion to surcharge the DIP Lenders, the Loan or the Collateral under 11 U.S.C. § 506(c) or otherwise;

(d)    the filing of a motion by any of the Borrowers for entry of an order staying or otherwise prohibiting the prosecution of any enforcement action or any motion or pleading seeking to challenge the DIP Lenders' or the Pre-Petition Debenture Lenders' Liens or otherwise commencing any cause of action against the Lenders or the Pre-Petition Debenture Lenders;

(e)     The Borrowers (except following the DIP Lenders' prior written request or with the DIP Lenders' express prior written consent) shall file a motion with the Bankruptcy Court or any other court with jurisdiction in the matter seeking an order, or an order is otherwise entered, modifying, reversing, revoking, staying, rescinding, vacating, or amending the Financing Orders or any of the DIP Loan Documents as modified by this Order, without the DIP Lenders' express prior written consent (and no such consent shall be implied from any other action, inaction, or acquiescence of the DIP Lenders);

(f)     The Borrowers shall file, or any other person shall obtain Bankruptcy Court approval of a disclosure statement for a Plan of Reorganization that does not (i) comply with the DIP Loan Agreement, including, without limitations, Sections 6.18, 7.12 (to the extent sale proceeds are sufficient to pay Prepetition Debenture Obligations in full) and 7.13 (provided that the Court's determination of appropriate sale procedures shall not be a default) of the DIP Loan Agreement  and (ii) pay in full the Tranche A and Tranche B Loanst;

(g)     The Final Order has not been entered by the Bankruptcy Court on or before August 14, 2010 or any of the Milestone Requirements have not been met;

(h)     The Borrowers shall file any motion or application, or the Bankruptcy Court allows the motion or application of any other Person, which seeks approval for or allowance of any claim, lien, security interest ranking equal or senior in priority to the claims, liens and security interests granted to the DIP Lenders under the Financing Orders or the DIP Loan Documents as modified by this Order, or any such equal or prior claim, lien, or security interest shall be established in any manner, except, in any case, as expressly permitted under the Financing Orders;

(i)     The Financing Orders shall cease to be in full force and effect at any time after the date of entry thereof by the Bankruptcy Court;

(j)     The occurrence of any Default or Event of Default pursuant to the terms of the Financing Orders;

(k)     Conversion of any of the Chapter 11 Cases to Chapter 7 cases under the Bankruptcy Code, or dismissal of any of the Chapter 11 Cases or any subsequent Chapter 7 cases either voluntarily or involuntarily;

(l)     Either of the Financing Orders shall be modified, reversed, revoked, remanded, stayed, rescinded, vacated or amended on appeal or by the Bankruptcy Court without the prior written consent of the DIP Lenders (and no such consent shall be implied from any other authorization or acquiescence by the DIP Lenders);

{00306606-1}35

(m) Entry of an order in any of the Chapter 11 Cases appointing a chapter 11 trustee or appointing an examiner with the power to take any action other than to investigate and report;

(n) Expiration or termination of the Borrowers' exclusive periods to file and confirm a Plan of Reorganization upon the earlier of the period set forth in the Plan Support Agreement or as ordered by the Bankruptcy Court;

(o) Entry of an order granting any other super-priority claim or lien equal or superior to that granted to the DIP Lenders, except with respect to the Pivotal GC Remaining Claim, prior to full and indefeasible repayment of the Obligations and the Adequate Protection Obligations (as defined in the Interim Order);

(p) Default in the performance, or breach, of any covenant or agreement of the Borrowers contained in the DIP Agreement, any of the DIP Loan Documents as modified by this Order, or any term or condition of either of the Financing Orders;

(q) Any Borrower shall fail to comply in any material respect with the Budget (after accounting for any variances permitted under Section 6.4(a) of the DIP Loan Agreement) or, without prior approval of the DIP Lenders, the Borrowers' cash balance plus the undrawn portion of the DIP Loan drops below $700,000;

(r) Breach of any of the obligations of the Borrowers under the Plan Support Agreement, including, without limitation, failure to adhere to the timetable set forth in the Plan Support Agreement; or

(s) The entry of an order (a) which provides relief from the automatic stay otherwise imposed pursuant to Section 362 of the Bankruptcy Code with respect to any material contract, lease, or obligation or against any critical vendor; (b) allowing a third party to proceed against any material assets or contracts of the Borrowers; (c) staying or otherwise prohibiting the prosecution of any Enforcement Action; (d) otherwise adversely affecting the DIP Lenders' or Prepetition Debenture Holders' liens.

(t) With the exception of the termination or suspension of operations contemplated by the Budget, any of the Borrowers shall liquidate, dissolve, terminate or suspend its business operation or otherwise fail to operate its business in the ordinary course or merge with another Person unless such Borrower is the surviving entity or the Borrowers consummate a sale of all or a material portion of such Borrower's assets without paying the aggregate amount of the Obligations due to the DIP Lenders, unless the DIP Lenders have consented or the Borrowers have otherwise satisfied the provisions of 11 U.S.C. §363(f) or the Court has determined that an alternative bid for such Borrower's assets is the highest and/or best bid;

{00306606-1}36

(u)     Any representation or warranty made by the Borrowers in the DIP Agreement, by any Guarantor in any Guaranty delivered to the DIP Lenders, or by the Borrowers (or any of their Officers) or any Guarantor in any agreement, certificate, instrument or financial statement or other statement contemplated by or made or delivered pursuant to or in connection with the DIP Loan Agreement or any such Guaranty shall prove to have been incorrect in any material respect when deemed to be effective;

(v)     The DIP Lenders believe in good faith that the prospect of payment in full of any part of the Obligations, or that full performance by the Borrowers under the DIP Loan Documents, is impaired, or that there has occurred any Material Adverse Effect in the business or financial condition of the Borrowers, provided that the Court shall have power to determine whether such belief is objectively reasonable upon motion by any party in interest, filed within 3 business days of such DIP Lenders' filing and service of notice, rendering any non-reasonable belief ineffective;

(w)     If any creditor of the Borrowers receives any adequate protection payment, other than utility deposits reclassified as adequate protection payments or deposits or payments to a utility covered by a utility order provided payment does not exceed the utility order amount and Budget, which is not fully acceptable to the DIP Lenders in their sole discretion, or any Lien is granted as adequate protection other than as set forth in the Financing Orders, including with respect to Pivotal GC.

(x)     A Change in Control occurs with respect to any Borrower;

(y)     Borrowers' failure to pay any post-petition obligation when due;

(z)     Any material impairment of the Collateral or the termination of any state or federal license or authorization or material contract; or

(aa)    The Borrowers fail to comply with any of the covenants, conditions and agreements contained herein or in any other agreement, document or instrument at any time executed by Borrowers in connection herewith (provided that the Court's determination of appropriate sale procedures shall not be a default).

Notwithstanding any termination of the post-petition financing facility, the DIP Lenders shall fund the Carve-Out .

18.     For purposes hereof, the "Carve Out" shall mean: (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the U.S. Trustee under section 1930(a)

{00306606-1}37

of title 28 of the United States Code; and (ii) to the extent not otherwise payable from proceeds of Collateral, all allowed fees and expenses incurred in the Chapter 11 Case by professionals retained by the Debtors or by the Committee (collectively, the "Retained Professionals") in amount not to exceed the sum of (A) all allowed fees and expenses incurred by the Retained Professionals prior to the occurrence of the Termination Date (whether allowed before or after the Termination Date) not to exceed the amounts set forth in the Budget, plus (B) after the occurrence of the Termination Date, an amount not to exceed the lesser of the remaining availability under the DIP Financing or $150,000 in the aggregate, less (C) unapplied pre-petition retainers.

19.     No Marshalling.  In no event shall the DIP Lenders be subject to the equitable doctrine of marshalling or any similar doctrine with respect to the DIP Obligations or any of the property comprising the Collateral.

20.     Limits on the Lenders' Liability.  Nothing in this Order or in any of the DIP Loan Documents or any other documents related to the financing transactions authorized hereby shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Lenders of any liability for any claims arising from the pre-petition or post-petition activities by the Debtors in the operation of its business, or in connection with its restructuring efforts.  Subject to entry of a Final Order, the DIP Lenders shall not, in any way or manner, be liable or responsible for (a) the safekeeping of the Collateral, (b) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (c) any diminution in the value thereof, or (d) any act or default of any carrier, servicer, bailee, custodian, forwarding agency or other person, and all risk of loss, damage or destruction of the Collateral shall be borne by the Debtors.

21.     Lenders' Right to Credit Bid.  One or more of the DIP Lenders or the Prepetition Debenture Lenders shall have the right to credit bid with respect to any sale of assets or equity under either section 363 of the Bankruptcy Code or a Plan of Reorganization, the amount, (i) with respect to a DIP Lender, such respective DIP Lender advanced under the Post-Petition Financing, and (ii) with respect to a Prepetition Debenture Lender, such Prepetition Debenture Lender's portion of the Prepetition Debenture Obligations, which credit bid rights under section 363(k) of the Bankruptcy Code or otherwise shall not be impaired in any manner, and such Lender and Prepetition Debenture Lender, as the case may be, may also credit bid and/or exercise rights as a secured creditor with respect to assets and any sale of assets of non-debtor Magenta, with all of DIP Lender(s)' rights as a secured creditor of that U.K. entity.  For the avoidance of ambiguity, no future order or plan may impair the credit bid rights of the DIP Lenders or the Prepetition Debenture Lenders, and no credit bid provisions in the DIP Loan Documents, Financing Orders, sale procedures orders, or any other agreement or order shall impair or alter in any way the rights of the Debtors, Committee, Pivotal GC, or any party in interest to assert or the Court to determine that an alternative bid is higher and/or better than any such credit bid of the DIP Lenders or Prepetition Debenture Lenders.

22.     No Waiver by DIP Lenders.  Notwithstanding anything to the contrary herein, the entry of this Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, or otherwise impair any of the rights of the DIP Lenders under the Bankruptcy Code or under non-bankruptcy law, including, without limitation, the right of the DIP Lenders to (a) request the conversion of any of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code or the appointment of a chapter 11 trustee, examiner, fiduciary, or responsible person with expanded powers, (b) propose, subject to the provisions of section 1121 of the

{00306606-1}39

Bankruptcy Code, a chapter 11 plan or plans of reorganization or liquidation for the Debtors, or (c) request modification of the automatic stay pursuant to section 362 of the Bankruptcy Code.

23. <u>Release</u>. Subject to paragraph 24, in consideration for the Post-Petition Financing, each of the Debtors, on behalf of itself and its successors and assigns (collectively, the "<u>Releasors</u>"), hereof, shall forever release, discharge and acquit the DIP Lenders and the Prepetition Debenture Lenders and their respective officers, directors, employees, agents, attorneys and predecessors in interest of and from any and all claims, demands, damages, liabilities, responsibilities, disputes, remedies, actions, causes of action, indebtedness and obligations, of every type, including, without limitation, any so-called "lender liability" claims or defenses, which arose on or prior to the date this Order is entered with respect to the Debtors and/or the Post-Petition Financing; <u>provided, however</u>, the foregoing release shall not release the DIP Lenders or the Prepetition Debenture Lenders from their obligations under this Order.

24. <u>Committee Review Period</u>

(a) Notwithstanding anything contained herein to the contrary, the extent, validity, priority, perfection, and enforceability of the Prepetition Debenture Obligations, the Prepetition Liens, and all acknowledgments, admissions, and confirmations of the Debtors and their affiliates above, are for all purposes subject to the rights of any party in interest (including any trustee elected or appointed in these Chapter 11 Cases), other than any Debtor or any of its respective affiliates, to file a complaint pursuant to Bankruptcy Rule 7001 seeking to invalidate, subordinate, or otherwise challenge (collectively, the "<u>Challenges</u>") the Prepetition Debenture Obligations or the Prepetition Liens; <u>provided, however</u>, that any such complaint must be filed in this Court within the later of 60 days after appointment of the Committee (but in no event later than 75 days after entry of this Order) or any subsequent date that may be agreed to in writing by

the Prepetition Debenture Lenders with respect to the time to file any such complaint relating to the Prepetition Debenture Obligations and/or the Prepetition Liens. If no such complaint is filed within such time period, then any and all Challenges shall be, without further notice to or order of the Court, deemed to have been forever relinquished, released, and waived as to such Committee and other person or entity, and if such complaint is timely filed on or before such date, any and all Claims and Defenses against any of the Prepetition Debenture Lenders shall be deemed, immediately and without further action, to have been forever relinquished, released, and waived as to such Committee and other person or entity, except with respect to Claims and Defenses that are expressly asserted in such complaint, unless such claims in accordance with the Federal Rules of Civil Procedure relate back to the date the complaint was filed.

(b) If no such complaint as to the Prepetition Debenture Obligations or Prepetition Liens is filed within such time period, or such timely filed complaint does not result in a final and non-appealable order of this Court that is inconsistent with this paragraph, then, without the requirement or need to file any proof of claim with respect thereto, (i) the Prepetition Debenture Obligations shall constitute allowed secured claims for all purposes in the Chapter 11 Cases and any subsequent cases or proceedings under the Bankruptcy Code, including, without limitation, any chapter 7 proceedings if any Chapter 11 Case is converted to a case under chapter 7 of the Bankruptcy Code (each, a "Successor Case"), (ii) the Prepetition Liens shall be deemed legal, valid, binding, enforceable, perfected liens not subject to recharacterization, subordination (except as expressly specified in this Order as to the Carve-Out, the Liens and the Adequate Protection Liens) or avoidance for all purposes in the Chapter 11 Cases and any Successor Case, and (iii) the Prepetition Debenture Obligations, the Prepetition Liens, and prior payments on account of or with respect to the Prepetition Debenture Obligations shall not be subject to any

{00306606-1}41

other or further claims, cause of action, recharacterization, objection, contest, setoff, defense, or challenge by any party in interest for any reason, including, without limitation, by any successor to or estate representative of any Debtor, subject to the Pivotal GC Intercreditor Agreements.

25.     Prepetition Agents.     The Prepetition Agents shall have no liability for the enforceability of the DIP Loan Documents or any of the liens granted herein. The Prepetition Agents shall have no obligation to maintain perfection of any of the liens granted herein.

26.     Section 506(c) Waiver.     Subject to entry of a final order, except for the Carve-Out, no costs or expenses of administration which have been or may be incurred in the Chapter 11 Cases or any future proceedings or cases related hereto, at any time, shall be charged against the DIP Lenders or the Prepetition Debenture Lenders, their claims, or the Collateral, pursuant to sections 105, 506(c) or 522 of the Bankruptcy Code, or otherwise, without the prior written consent of the DIP Lenders or the Prepetition Debenture Lenders, as applicable, and no such consent shall be implied from any other action, inaction, or acquiescence by the DIP Lenders or the Prepetition Debenture Lenders.

27.     Retention of Financial Advisor.     The DIP Lenders may immediately hire and retain a financial advisor of their choosing to monitor the orderly operation of the Debtors' business and compliance with the Budget until a plan of reorganization is confirmed or the closing of a sale of all or substantially all of the Debtors' assets, whichever is earlier. The Company shall fully cooperate with such financial advisor and its requests and provide complete transparency regarding all financial and operational issues of the Debtors. The Debtors shall pay the fees and expenses of such financial advisor upon presentment of an invoice, up to $25,000 per month. In the event the fees and expenses of such financial advisor are less than $25,000 in any given month(s), the difference between $25,000 and the fees and expenses incurred for such

month(s) may be applied to any other month(s) in which such financial advisor's fees and expenses exceed $25,000.

28. The DIP Lenders' professionals and Pivotal CG to the extent it has a Pivotal GC Remaining Claim shall submit all invoices submitted in connection with the DIP Loan to the Debtors, the United States Trustee and the Creditors' Committee. If no objection are received within ten (10) days, the Debtors shall immediately pay the invoices. If an objection is received, the Court shall resolve the objection if not resolved by the parties.

29. <u>Successors and Assigns</u>. To the fullest extent permitted by law, the DIP Loan Documents as modified by this Order and the provisions of this Order shall be binding upon the DIP Lenders, the Prepetition Debenture Lenders and the Debtors and each of their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of any of the Debtors or any examiner appointed pursuant to section 1104 of the Bankruptcy Code in the Chapter 11 Cases or any subsequent chapter 7 case) and the Committee, and shall inure to the benefit of the DIP Lenders and the Debtors and (except with respect to any trustee hereinafter appointed or elected for the estate of the Debtors) their respective successors and assigns; *provided, however*, that the DIP Lenders shall have no obligation to extend any financing to any chapter 7 trustee or similar responsible person appointed for the estate of the Debtors.

30. <u>Subsequent Liens</u>. If the Court grants liens or security interests to others pursuant to Section 364(d) of the Bankruptcy Code or any other provision of the Bankruptcy Code, which liens or security interests of the Lenders or the Prepetition Debenture Lenders in the Collateral (collectively, the "<u>Subsequent Liens</u>"), any proceeds of the loans or extensions of credit secured by Subsequent Liens shall be applied first to payment of the DIP Obligations.

{00306606-1}43

31.     Binding Nature of Findings. The findings contained in this Order shall be binding upon all parties in interest.

32.     Immediate Effectiveness. Notwithstanding Bankruptcy Rules 6004(h), 6006(d), 7062, or 9014 of the Bankruptcy Rules or any other Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Order.

33.     Conflicts. In the event of any conflict between or among the express terms or provisions of any of the DIP Loan Documents, and the terms and provision of this Order on the other hand, the terms and provisions of this Order shall govern.

34.     No Proof of Claim. The DIP Lenders and the Prepetition Debenture Lenders are hereby relieved of the requirements to file a proof of claim in the Chapter 11 Cases or any proceeding cases with respect to any DIP Obligations.

35.     Rights of Recoupment or Setoff. Notwithstanding anything to the contrary in this Order, nothing in this Order shall (a) compromise, modify or affect the ability of any party in interest to assert a right of recoupment or setoff with respect to amounts allegedly owed to the Debtors, or (b) create any right of recoupment or setoff with respect to amounts allegedly owed to the Debtors (except to the extent expressly provided for in the DIP Loan Documents and subject to the Pivotal GC Intercreditor Agreements).

36.     No Third Party Beneficiaries. Nothing in this Order shall create any right for the direct or indirect benefit of any person other than the parties to the DIP Loan Documents and Pivotal GC.

37.     Retention of Jurisdiction. The Bankruptcy Court shall retain jurisdiction to hear and determine all matters arising from this Order and its implementation.

1010911-12
1027990-4

38. <u>Authority</u>. The Debtors are authorized to perform all acts, and execute and comply with the terms of such other documents, instruments and agreements the DIP Lenders may reasonably require, as evidence of and for the protection of the Post-Petition Financing, or which otherwise may be deemed reasonably necessary by the DIP Lenders to effectuate the terms and conditions of this Order and the Post-Petition Loan Documents.

39. <u>Final Hearing</u>.

(a) A final hearing on the Motion (the "<u>Final Hearing</u>") is hereby scheduled for August 13, 2010 at 9:30 a.m. Eastern Time.

(b) Upon the scheduling of the Final Hearing, the Debtors shall promptly mail copies of this Order to counsel for the DIP Lenders, counsel for the Committee, the United States Trustee, Pivotal GC, and any other persons entitled to notice under Bankruptcy Rule 4001(b). Any party in interest objecting to the entry of a final order approving the Motion shall file a written objection with the Clerk of the Court no later than 4:30 p.m. Eastern Time on August 9, 2010, which objection shall be served, at a minimum, on the following parties: (i) Heller, Draper, Hayden, Patrick & Horn, L.L.P., 650 Poydras Street, Suite 2500, New Orleans, Louisiana 70130 (Attn: Douglas S. Draper and Leslie A. Collins) ddraper@hellerdraper.com and lcollins@hellerdraper.com; (ii) Womble Carlyle Sandridge & Rice, PLLC, 222 Delaware Ave., Suite 1501, Wilmington, DE 19801 (Attn: Francis A. Monaco, Jr.) fmonaco@wcsr.com; (iii) Olshan Grundman Frome Rosenzweig & Wolosky LLP, Park Avenue Tower, 65 East 55th Street, New York, NY 10022 (Attn: Adam H. Friedman) afriedman@olshanlaw.com; (iv) Young, Conaway, Stargatt & Taylor, LLP, The Brandywine Building, 1000 West Street, 17th Floor, Wilmington, DE 19801 (Attn: Robert S. Brady) rbrady@ycst.com; (v) Greenberg Traurig, LLP, 200 Park Avenue, Florham Park, NJ 07932-0677 (Attn: Alan J. Brody) BrodyA@gtlaw.com; (vi)

{00306606-1}45

Greenberg Traurig, LLP, The Nemours Building, 1007 North Orange Street, Suite 1200, Wilmington, DE 19801 (Attn: Matthew L. Hinker) hinkerm@gtlaw.com; (vii) Lewis and Roca LLP, 40 North Central Avenue, Suite 1900, Phoenix, AZ 85004 (Attn: Susan M. Freeman) SFreeman@LRLaw.com; (viii) Pachulski Stang Ziehl & Jones, 919 North Market Street, 17th Floor, Wilmington, DE 19801 (Attn: Laura Davis Jones) ljones@pszjlaw.com; and (ix) Global Capacity Group, Inc., 200 South Wacker, Suite 1650, Chicago, Illinois 60606 (Attn: Dan Kardatzke), DKardatzke@globalcapacity.com.

_____

The Honorable Peter J. Walsh
United States Bankruptcy Judge

Dated:    July ___, 2010

1010911-12
1027990-4