# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | § | Chapter 11 |
| | § | |
| GLOBAL CAPACITY HOLDCO, | § | Case No. 10-12302 (PJW) |
| LLC, <u>et al.</u>[1] | § | (Jointly Administered) |
| | § | |
| Debtors. | § | **Hearing Date: 11/19/2010 at 2:00 p.m.** |
| | § | **Objections Due: 11/15/2010 at 4:00 p.m.** |
| | § | |

## MOTION TO APPROVE DEBTORS' SELECTION OF THE BID OF PIVOTAL GLOBAL CAPACITY LLC AS THE QUALIFYING BID FOR THE PURCHASE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS UNDER OR IN CONJUNCTION WITH ITS PLAN OF REORGANIZATION AND CONSUMMATION OF THE SALE TRANSACTION WITH PIVOTAL GLOBAL CAPACITY LLC

The debtors and debtors-in-possession in the above captioned cases (the "<u>Debtors</u>"), by and through undersigned counsel, hereby file this Motion (the "<u>Motion</u>") to Approve Debtors' Selection of the Bid of Pivotal Global Capacity LLC as the Qualifying Bid for the Purchase of Substantially all of the Debtors' Assets under or in Conjunction with its Plan of Reorganization and Consummation of the Sale Transaction with Pivotal Global Capacity LLC ("<u>Pivotal</u>"). In support of the Motion, the Debtors respectfully state as follows:

---

[1] The Debtors in these cases, along with their case numbers, addresses, and the last four digits of each Debtor's federal tax identification number, are: Global Capacity Holdco, LLC, 200 S. Wacker Drive, Suite 1650, Chicago, IL 60606 (10-12302) (8858); Global Capacity Group, Inc., 730 North Post Oak Road, Houston, TX 77024 (10-12303) (0073); 20/20 Technologies, Inc., 200 South Wacker, Suite 1650, Chicago, IL 60606 (10-12304) (5612); Centrepath, Inc., 275 Winter Street, Waltham, MA 02451 (10-12305 (9034); Capital Growth Systems, Inc., 200 South Wacker Drive, Suite 1650, Chicago, IL 60606 (10-12306) (3505); Global Capacity Direct, LLC (f/k/a Vanco Direct USA, LLC), 200 South Wacker Drive, Suite 1650, Chicago, IL 60606 (10-12307 (1970); FNS 2007, Inc. (fka Frontrunner Network Systems, Corp.), 200 South Wacker Drive, Suite 1650, Chicago, IL 60606 (10-12308) (7892); Nexvu Technologies, LLC, 200 South Wacker Drive, Suite 1650, Chicago, IL 60606 (10-12309) (4626); Capital Growth Acquisition, Inc., 200 South Wacker Drive, Suite 1650, Chicago, IL 60606 (10-12311) (4116); and 20/20 Technologies I, LLC, 200 South Wacker Drive, Suite 1650, Chicago, IL 60606 (10-12310) (5514).

## JURISDICTION AND VENUE

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This Motion concerns the administration of the Debtor's estate, and, therefore, is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the relief requested herein are 11 U.S.C. § 105(a) and 363.  An additional basis for the relief requested herein is Fed. R. Bankr. P. 6004.

## BACKGROUND

2.      On July 23, 2010 (the "Petition Date"), the Debtors each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases"). The Debtors are operating their business and managing their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  On July 24, 2010, the Court entered an order consolidating these Chapter 11 Cases for procedural purposes only.

3.      On August 6, 2010, the United States Trustee appointed an official committee of unsecured creditors (the "Committee") in these Chapter 11 Cases.

4.      On August 11, 2010, Debtors filed a motion for entry of an order approving bidding procedures in connection with the sale of substantially all of the Debtors' contracts and unexpired leases, approving stalking horse bid protections, approving the form and  manner of notice of a sale hearing, and for entry of an order approving and authorizing the sale of substantially all of the Debtors' assets free and clear of liens, claims, interests and encumbrances and authorizing the assumption and assignment of executory contracts and unexpired leases as part of the sale [D.I. 115) (the

"Sale Motion").  The conditional purchaser, pursuant to the Motion, was a shell entity known as Global Acquisition Newco Corp. ("GAC").  GAC was an entity formed by the Debtors' Tranche B Lenders and the pre-petition junior debenture holders (the "Junior Debenture Holders") solely to acquire substantially all of the assets of the Debtors.

5.      The Sale Motion was filed in conjunction with the Joint Chapter 11 Plan of Reorganization for Debtors dated as of August 11, 2010 [D.I. 113] (the "Plan").  The proposed sale to GAC provided the financial underpinning for the Debtors' Plan and the payment of all classes of its creditors.

6.      On August 24, 2010, the Court entered an order approving the Debtors' Motion and (as amended thereafter, the "Bidding Procedures"), scheduled an auction (the "Auction") for October 14, 2010 and a sale approval hearing (the "Sale Hearing") for the winning bidder for October 19, 2010, and granted the additional relief set forth in the Sale Motion (the "Sales Procedures Order") [D.I. 171].

7.      The Sale Motion and Plan were filed in conjunction with a Plan Support Agreement negotiated between the Debtors, the Tranche B Lenders and its Junior Debenture Holders.

8.      The Sale Motion and Plan designated GAC as the "conditional stalking horse bidder."  The GAC bid contained in the Sale Motion and Plan would become the stalking horse bid if the Tranche B Lenders or GAC could provide evidence by September 24, 2010 (deadline required by the Plan Support Agreement) that GAC possessed sufficient funds or commitments to fund the payments set forth in the Debtors' Plan.

9.      The six week period between the filing of the Motion and the date the

GAC needed to provide evidence of funds was designed to provide the Tranche B Lenders and the Junior Debenture Holders on behalf of GAC with sufficient time to raise the money or obtain agreements to fund the Debtors' Plan under the proposed sale.

10. With the approval of the Tranche B Lender and Junior Debenture Holders, the Debtors hired Capstone Investments to assist the Tranche B Lenders and GAC to raise the necessary capital or find buyers for the Debtors' assets. In fact, the Capstone fee arrangement was negotiated and approved by Rich Gammill of Black River Asset Management, Robert J. Jesenik of Aequitas Capital and Alan Benaim PM of Midsummer Capital on behalf of the Tranche B Lenders.

11. Capstone Investments ran an exhaustive process on behalf of the Debtors, the Tranche B Lenders, and GAC to secure the necessary exit capital and/or seek buyers to acquire the Debtor's assets. Upon completion and approval of marketing materials in early August, Capstone began contacting a diverse set of investment firms including mutual funds, hedge funds, private equity firms, and strategic telecom services companies to introduce the opportunity and gauge the market's interest. The Tranche B Lenders requested Capstone market the opportunity and obtain exit capital at a $30 million pre-money valuation. At the same time, Capstone was requested to find potential buyers of the Debtor's assets for the Initial Overbid Amount Requirement in an amount in excess of $40 million.

12. In general, the marketing process included a Capstone representative contacting the financial and strategic prospects, describing the Debtor's business and the facts of what led the Debtor into Chapter 11, and soliciting confidentiality agreements in an effort get groups into a data room to conduct additional due diligence; 23 parties

executed the confidentiality agreement. Once under a confidentiality agreement, Capstone provided all necessary information and coordinated calls and meetings with the Debtors and/or Tranche B Lenders as necessary.

13.     Capstone formally reported updates and progress to the Debtors and Tranche B Lenders on a weekly basis, and more frequently provided verbal updates as requested. While the response from each prospective exit capital provider and strategic prospect was different, the general theme was the proposed valuation was too high given the Debtor's historical performance and the risks involving its restructurings. The Debtor's business is a highly-specialized niche business, and most of the strategic prospects were not interested since it was outside of their core competencies. During the course of the process, Capstone contacted 104 financial investors/buyers and 36 strategic prospects.

14.     In late September, the Debtors and its advisors on at least three occasions requested the Tranche B Lenders and the Junior Debenture Holders on behalf of GAC to provide evidence that it had sufficient funds or agreements to fund the costs associated with the Debtors' Plan.

15.     On September 23, 2010, the Debtors received a letter from GAC advising that it possessed and had the funds to fund the Plan. No documentation was attached to the letter in support of the statement contained in the letter.

16.     On September 29, 2010, the Debtors through its advisors requested counsel for the Tranche B Lenders and Junior Debenture Holders on behalf of GAC to provide evidence that the commitment set forth in the letter was in fact accurate by providing evidence of the individual commitment by each of the GAC participants.

17.     No documentation was ever provided with respect to the Debtors' due diligence requests contained in its September 29, 2010 letter.

18.     The bid procedures approved by the Court required that, in the event the conditional "stalking horse" became the stalking horse, any party wishing to acquire the Debtors' assets would have to bid in excess of $40,000,000 (Initial Overbid Amount Requirement).  If no bid met the Initial Overbid Amount Requirement, then no Auction would be held and GAC would be the purchaser of substantially all of the Debtors' assets under the Plan.  Plan confirmation was set for November 2, 2010.

19.     The Debtors and their advisors cautioned the Tranche B Lenders and the Junior Debenture Holders and GAC that the $40,000,000 plus Initial Overbid Amount Requirement would likely limit the number of possible buyers and deter the number of prospective purchasers from doing meaningful due diligence.  Likewise, the alternative of putting a $30,000,000 pre-money valuation to attract a financing source for the GAC bid (as required by GAC) was equally problematic.

20.     The Tranche B Lenders and the Junior Debenture Holders advised, however, that due to priorities among the Tranche B Lenders and to avoid disputes between them, the Initial Overbid Amount Requirement was necessary.

21.     No bids meeting the Initial Overbid Amount Requirement were received by the Debtors by October 7, 2010.

22.     When no evidence of funding sources or commitments was produced by GAC, the Debtors were faced in late September with a "conditional stalking horse" without the funds to close the sale and no prospect of a bidder who would bid the Initial Overbid Amount Requirement

23.     In order to exit Chapter 11 in the most efficient manner possible (cost and time), the Debtors terminated the GAC conditional stalking horse status in accordance with the Plan Support Agreement and the Debtors amended and modified the bid procedures to open up the bidding process to allow the Debtors to entertain offers from other entities who had previously expressed interest but were unwilling to bid the Initial Overbid Amount Requirement.

24.     The modified bidding procedures opened up the bidding process and required that bidders provide: (i) a marked-up asset purchase agreement; and (ii) evidence of financial capability.  The modified procedures gave buyers a 48-hour period after being designated as the winning bidder to provide hard evidence of the funding necessary to close the sale.

25.     On October 18 (extended from October 11 at the request of the Tranche B Lenders and the Junior Debenture Holders) under the modified bid procedures, the Debtors received three bids.  The bids were the following:

   a)   GAC who provided a modified bid, an APA and no new evidence of funding;

   b)   Pivotal Global Capacity Acquisition (Pivotal)  submitted a bid (as amended, the "Pivotal GC Bid") with an attached form of Asset Purchase Agreement (as amended, the "Pivotal APA"), evidence of financial ability to close, and all other documents required to be a Qualified Bidder; and

   c)   Global Telecom & Technology, Inc. ("GTT") submitted a bid without a form of Asset Purchase Agreement or schedules

and without any specific evidence of financial ability to close.

26. On October 21, 2010, the Auction was commenced in Chicago, Illinois. The Debtors noted, at the inception of the auction, that they had received three non-conforming bids but that they would not disqualify any bidder. The Debtors announced their goal was to obtain the highest bid from each party and then bring those bids back to the Board to make a selection to recommend to the Court.

27. The initial bids from GAC, GTT and Pivotal contained elements which would allow the Debtors to accomplish their stated goal of confirming a plan. Each of the bids contained consideration to pay the administrative and priority creditors of the estate.

28. At the auction, the Debtors met with each bidder and suggested that each bidder make certain modifications to its bid to make the bid acceptable to the Debtors.

29. The Chicago Auction did not result in a bid that was acceptable to the Debtors and the auction was adjourned and rescheduled to convene two business days later in New York.

30. On October 25, 2010, the Auction continued in New York.

31. GTT, during the course of the Auction in Chicago, entered into negotiations with the Tranche B Lenders and GAC. The result of the negotiation was that GTT submitted a new bid through counsel for GAC the evening before the Auction began in New York. The new bid was radically different than the bid made in Chicago, where GTT had once provided for sufficient consideration to be paid to the Debtors to confirm a plan. The new restructured bid would result in the Junior Debenture Holders receiving a

vast majority of the sales proceeds after prepayment and with structured dismissal of the case. The reallocation failed to take into account that some of the assets GTT intended to acquire in the sale included assets that were free and clear of any lien or claim. The free and clear assets included, but were not limited to, the Debtors' cash, the Debtors' avoidance actions, and any increase in value of the Debtors assets due to the Debtors' licenses to operate.

32.     The Debtors, at the conclusion of the auction, asked both GTT and Pivotal to provide the Debtors with each party's best offer to take back to the Debtors' Board.

33.     On October 26, 2010, Pivotal provided the Debtors with a formal, written amendment to the Pivotal GC Bid. The new Pivotal bid provided additional consideration of $500,000 for the estate and notes with a face value of $4,000,000 for the Junior Debenture Holders.

34.     The Board, at its meeting **later on October 26, 2010**, passed a resolution to recommend to the Court the revised Pivotal bid. The basis was that it was the bid most susceptible of plan confirmation and had the strongest financial backing. Notwithstanding the Board of Directors' recommendation of Pivotal, and with the consent of the Board, the Debtors' financial advisors continued to solicit bids and work with the existing bidders to maximize the value of the estate to all of its creditor constituencies.

35.     The next day, Capstone traveled to Virginia to meet with GTT to explain the selection of Pivotal and how the GTT bid could be revised to meet the Debtors' goals and then be recommended to the Court in conjunction with the Debtors' Plan.

36.     The bid of Pivotal, which the Debtor recommends as the highest and best

bid susceptible of being confirmed in a Plan, was not the highest in pure dollar terms. It was, however, the bid that could best be included in a Plan, provide the highest level of cash proceeds and the strongest documentation of its ability to close.

## I.     Material Terms of the Pivotal APA

37. The principal terms of the Pivotal APA are summarized in the following chart:[2]

| APA PROVISION | SUMMARY DESCRIPTION |
|---|---|
| APA Parties | Sellers: Capital Growth Systems, Inc. d/b/a Global Capacity, 20/20 Technologies, Inc., Magenta netLogic, Ltd., CentrePath, Inc., Global Capacity Group, Inc. and Global Capacity Direct, LLC.<br><br>Buyer: Pivotal Global Capacity |
| Consideration | $29,500,000 comprised of $24,500,000 cash to the estate, $1,500,000 cash as working capital to Newco, $4,000,000 face value of notes to the junior debenture holders;<br>the Cash Amount - equal to all outstanding obligations due to the Tranche A and Tranche B Lenders, administrative claims and priority claims; plus amounts required to pay Mission Critical Vendors; plus notes for the Pre-petition Debenture Holders |
| Acquired Assets | The APA sets forth the assets to be purchased (defined in the APA as "Purchased Assets") by Pivotal Global Capacity (the "Acquired Assets"), including, without limitation, all of Sellers' right, title and interest in, to and under all of Sellers' (other than the Excluded Assets) properties, assets, interests and rights of every nature, kind and description, tangible and intangible (including goodwill), whether real, personal or mixed, whether accrued, contingent or otherwise, existing as of the Closing, in each case that are used or useful in connection with or related to the Business. The Acquired Assets include security and vendor deposits, Avoidance Actions, prepayments and refunds existing with respect to assumed and assigned Real Property Leases and Contracts, as well as cash and cash equivalents, all shares of capital stock of Magenta Netlogic Limited (U.K.), certain Contracts and Real Property Leases. |
| Excluded Assets | The APA sets forth the assets that will be not be purchased by Pivotal that are not Acquired Assets. |
| Non-Transferred Assets | Avoidance Actions against parties that are not essential to the Debtors business |
| Assumed Liabilities | (a) Liabilities relating to the Business that arise from events, facts or circumstances that occur after the Closing;<br><br>(b) Sellers' obligations under the Contracts and the Real Property Leases, which are to be performed or which accrue after the Closing Date;<br><br>(c) Cure Amount payable under Section 365 of the Bankruptcy Code to cure monetary defaults under the Contracts, payments to Mission Critical Vendors |

[2] This summary is provided for the convenience of the Court and parties in interest. To the extent there is any conflict between this summary and the APA, the latter governs all respects. Capitalized terms used but not defined in this chart have the meaning ascribed in the APA

| | and the Real Property Leases in accordance with the provisions of the APA |
|---|---|
| | (d) The liabilities and obligations set forth on the schedules to the APA. |
| Excluded Liabilities | The APA sets forth the liabilities that will not be assumed by the Pivotal including the liabilities of Sellers that are not specifically, exclusively and entirely Assumed Liabilities. |
| Assumption of Executory Contracts and Unexpired Leases and Assignment to the Stalking Horse Bidder | All Intellectual Property owned by the Sellers, all Leases and the related Leased Real Property and other Contracts used primarily in the Business that are proposed to be assigned to Buyer pursuant to Section 365 of the Bankruptcy Code in connection with the Sale transactions set forth in the APA. |
| Payment of Cure Amounts | The APA provides that the Buyer is responsible for payment of all costs incident to the claims of the Mission Critical Vendors (includes parties that are not counter-parties to executor contracts). |
| Employment Provisions | <u>Transfer.</u> Buyer has the right, but not the obligation, to employ or engage as contractors any or all of the Employees as Buyer determines in its sole and absolute discretion. The terms of employment offered to any Employees will be determined by Buyer in its sole and absolute discretion. Buyer will deliver a list of the Employees it intends to hire in accordance with the terms of the APA. Any Employees actually employed by Buyer are referred to as "<u>Transferred Employees.</u>"<br><br><u>Service.</u> At Closing, Buyer will provide, or will cause to be provided, for the benefit of the Transferred Employees and their beneficiaries and dependents, employee welfare benefits plans as defined in Section 3(1) of ERISA that are no less favorable than those provided to the Transferred Employees, their beneficiaries and dependents, immediately prior to Closing. For all purposes under such employee welfare benefits plans of the Buyer, whether now existing or hereafter adopted, Buyer will credit (i) each Transferred Employee with his or her service with the Sellers, to the same extent such service would have been credited had such service been with Buyer, and (ii) the Transferred Employees with all service recognized by Sellers under employee plans as service with Buyer for purposes of eligibility to participate and vesting under all employee benefit plans, programs and policies of Buyer. |
| Closing Conditions | The APA includes closing conditions typical and customary for transactions of this kind, including, without limitation:<br><br>Buyer: (i) Sellers' representations and warranties are true and correct in all material respects, (ii) Sellers complied with all covenants under the APA, (iii) all required consents, approvals and actions of, filings with and notices to any Governmental Body or other Person have been obtained, delivered, made or given and be in effect, (iv) no event or failure to act causing a Material Adverse Effect has occurred, (v) Sellers delivered all closing deliverables to Buyer, (vi) Agreement has not been terminated by Buyer (vii) all conditions set forth in the Plan to be satisfied are satisfied prior to the Plan Effective Date, (vii) the Sale Order and Confirmation Order has been entered and not subject to a stay, (viii) telecommunications licensing and regulatory matters have been addressed as set forth in the APA, (ix) Management Agreement has been entered into and necessary Bankruptcy Court approvals obtained.<br><br>Seller: (i) Buyer's representations and warranties are true and correct in all material respects, (ii) Buyer complied with all covenants under the APA, (iii) all required consents, approvals and actions of, filings with and notices to any Governmental Body or other Person have been obtained, delivered, made or given and be in effect, (iv) Buyer delivered all closing deliverables to Seller, (v) Buyer paid Mission Critical Vendors or made arrangement, satisfactory to the Sellers, to promptly pay the Mission Critical Vendors,(vi) Buyer paid the Cash Amount, (vii) Buyer holds authorization to offer telecommunications services, if required, and (viii) Agreement has not been terminated by Buyer. Buyer has the funds necessary to, upon Closing, fund (i) the wind down budget; and (ii) the assumed administrative and priority claims. |
| Representations, Warranties and Covenants | The APA includes representations, warranties and covenants made or |

| | |
|---|---|
| | agreed to by the parties typical and customary for bankruptcy transactions of this kind, including, without limitation, representations, warranties and covenants relating to (i) organization and good standing, (ii) authorization, (iii) no-conflicts and consents of third parties, (iv) title to and sufficiency of Assets, (v) intellectual property, (vi) environmental matters, (vii) compliance with laws and permits, and (viii) absence of changes. |
| Bid Protections | None |
| Deposit | N/A |

## II.    Provisions to be Highlighted under the Local Rules

38.    The APA contains the following terms, conditions and provisions that are to be highlighted pursuant to Local Rule 6004-1(b):

39.    **Sale to Insider**.  The buyer is comprised of entities that are not insiders of the Debtors, as that term is defined in the Bankruptcy Code.

40.    **Private Sale/No Competitive Bidding**.  Not applicable.

41.    **Closing and Other Deadlines.**  Closing upon regulatory approval and 194 days after the sale order is approved.

42.    **Interim Arrangements with Proposed Buyer.**  The APA provides that the parties to the APA shall use commercially reasonable efforts to cooperate to provide an orderly transition of the Acquired Assets and Assumed Liabilities and to minimize any disruption resulting from the transactions contemplated by the APA.

43.    **Use of Proceeds.**  The APA is the centerpiece of the Debtors Plan of Reorganization.  The plan will provide for payment of:

1.    administrative expenses;

2.    outstanding DIP loan;

3.    priority claims;

4.    a note in the amount of $4,000,000 to pay a portion of the

claims of the pre-petition Junior Debenture Holders claims;

5. payment or assumption of the claims of Mission Critical Vendors and other assumed Executory Contracts and Leases; and

6. wind down budget for the estate.

44. **Tax Exemption.** As provided in the Debtors' Proposed Chapter 11 Plan of Reorganization, to the fullest extent permitted by applicable law, the Sale, and any assumption, assignment, and/or sale by the Debtors of their interests in unexpired leases of non-residential real property or executory contracts pursuant to section 365(a) of the Bankruptcy Code, shall constitute a "transfer under a plan" within the purview of section 1146 of the Bankruptcy Code, and shall not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax.

45. **Record Retention.** The Debtors will have access to their books and records sufficient to administer the bankruptcy estate.

46. **Sale of Avoidance Actions.** The APA provides for the Buyer's acquisition of substantially all actions under 11 U.S.C. §§ 544 through 550 of the Bankruptcy Code. The Debtors are generally only retaining Avoidance Actions against persons, firms or entities that are not customers, Mission Critical Vendors, critical vendors, or entities that are important to the operation of the Debtors business.

47. **Requested Findings as to Successor Liability.** The APA requires that the Sale Order include certain findings that the Acquired Assets are being sold free of successor or other similar liability as part of its offer to purchase the Acquired Assets and enter into the APA. In light of the extensive marketing of this transaction,

sufficient notice of the Sale (which includes a disclosure regarding the successor liability findings in the Sale Order) to parties in interest and the non-voluminous nature of such findings, the Debtors believe the inclusion of same in the Sale Order is appropriate and reasonable when balanced against the Sale benefits.

48. **Sale Free and Clear of Unexpired Leases.** The APA requires that the Sale Order provide that the Acquired Assets are being sold free and clear of all liens, real property licenses and other rights. In light of the extensive marketing of this transaction, sufficient notice of the Sale (which includes a disclosure regarding the successor liability findings in the Sale Order) to parties in interest and the non-voluminous nature of such findings, the Debtors believe the inclusion of same in the Sale Order is appropriate and reasonable when balanced against the Sale benefits.

49. **Credit Bid.** Not applicable.

50. **Relief from Bankruptcy Rule 6004(g).** n/a

**III. The Sale Order Should be Entered on the Terms Proposed.**

    A. **The Sale should be Approved as an Exercise of the Debtors' Sound Business Judgment.**

51. Section 363(b) of the Bankruptcy Code provides that a debtor may sell property of the estate outside the ordinary course of business after notice and a hearing. Although Bankruptcy Code section 363 does not specify a standard for determining when it is appropriate for a court to authorize the use, sale or lease of property of the estate, courts in this district and elsewhere have found that a debtor's sale or use of assets outside the ordinary course of business should be approved if the debtor can demonstrate a sound business justification for the proposed transaction. See, e.g., Myers v. Martin (In re Martin), 91 F.3d 389, 395 (3d Cir. 1996); In re Abbotts Dairies of Penn., Inc., 788 F.2d 143 (3d Cir. 1986); In

re Lionel Corp., 722 F.2d 1063, 1071 (2d Cir. 1983); In re Eagle Picher Holdings, Inc., 2005 Bankr. LEXIS 2894, at *3 (Bankr. S.D. Ohio 2005). Once the Debtors articulate a valid business justification, "[t]he business judgment rule 'is a presumption that in making the business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company.' In re S.N.A. Nut Co., 186 B.R. 98 (Bankr. N.D. Ill. 1995); see also In re Integrated Res., Inc., 147 B.R. 650, 656 (Bankr. S.D.N.Y. 1992); In re Johns-Manville Corp., 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("a presumption of reasonableness attaches to a Debtor's management decisions").

52.     The sale of a debtor's assets is appropriate where there are sound business reasons behind such a determination. See Myers, 91 F.3d at 395; see also Stephens Indus., Inc. v. McClung, 789 F.2d 386 (6th Cir. 1986) (sale of substantially all assets of estate authorized where "a sound business purpose dictates such action"); In re Del & Hudson Ry. Co., 124 B.R. 169, 176 (D.D.C. 1991); Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp., (In re Montgomery Ward Holding Corp.), 242 B.R. 147, 153 (Bankr. D. Del. 1999). The Debtors have a sound business justification for selling the "Assets" pursuant to the process employed by the Debtors. Based on the results of their analysis of the Debtors' ongoing and future business prospects, the Debtors' management and team of financial advisors have concluded that a sale of all of the Assets is the best method to maximize recoveries to the estates. Maximization of the Assets' value is a sound business purpose warranting authorization of any proposed sale.

53.     The Debtors have finished a fair and open process that obtained the highest and best offer such that the Debtors could confirm a plan and benefit the

Debtors' creditors. The fairness and reasonableness of the consideration offered by the Debtors were, in fact, tested by the market place.

(i)      <u>A Sound Business Purpose Exists for the Sale.</u>

54.     The Debtors have a sound business justification for entering into this transaction, including converting underperforming assets into cash that can be used to pay creditors or fund the estates through confirmation a chapter 11 plan that effectuates a discharge of the remaining claims, interests, liens and other "Excluded Liabilities" not assumed as part of the sale pursuant to Sections 541 and 1141 of the Bankruptcy Code.

55.     Indeed, it was only after (a) potential alternatives were evaluated, (b) the transaction was aggressively marketed, (c) multiple rounds of competing proposals were evaluated and analyzed and (d) all of the foregoing was presented to the members of the board (who, in conjunction with advice from experienced professionals, discharged their fiduciary duties, exercised sound and appropriate business judgment and determined to pursue the Sale on the terms of the APA, subject to competitive bidding sanctioned by the Court).

56.     Thus, for the reasons set forth herein, as will be further shown at the Sale Hearing, because the APA constitutes the highest or otherwise best offer for the Assets to address the claims of the most creditor constituencies, on balance of the facts and circumstances of moment, and provides greater recovery for these estates than any known or practicably available alternative, the Debtors submit that the execution thereof represents sound reasonable business judgment.

        (ii)     <u>The Sale and Purchase Price Reflects a Fair Value Transaction.</u>

57.     It is a well-settled that, where there is a fair open auction process, a full and fair price is presumed obtained for the assets sold, as the best way to determine value is exposure to the market. <u>See Bank of Am. Nat'l Trust & Say. Ass'n. v. LaSalle St. P'ship,</u> 526 U.S. 434, 457 (1999); see <u>also In Re Trans World Airlines, Inc.,</u> No. 01-00056, 2001 Bankr. Lexis 980, at *13 (Bankr. D. Del. April 2, 2001) (while a "§ 363(b) sale transaction does not require an auction procedure," "the auction procedure has developed over the years as an effective means for producing an arm's length fair value transaction"). This is especially true here, where the Acquired Assets and related transaction have both been subjected to an extensive marketing process, reviewed by outside professionals firms and intensively scrutinized by the Debtors and their retained advisors.

        (iii)    <u>The Sale has been Proposed in Good Faith and Without Collusion and the Successful Bidder is a "Good Faith Purchaser"</u>

58.     While the Bankruptcy Code does not define "good faith," the Third Circuit has held that "the phrase encompasses one who purchases in 'good faith' and for 'value.'" <u>In re Abbotts Dairies,</u> 788 F.2d at 147 (to constitute lack of good faith, a party's conduct in connection with the sale must usually amount to fraud, collusion between the purchaser and other bidders or the trustee or an attempt to take grossly unfair advantage of other bidders); see <u>also In re Perona Bros., Inc.,</u> 186 B.R. 833, 839 (D.N.J. 1995); <u>In re Bedford Springs Hotel, Inc.,</u> 99 B.R. 302, 305 (Bankr. W.D. Pa. 1989).

59.     In other words, a party would have to show fraud or collusion between

the buyer and the debtor in possession or trustee or other bidders in order to demonstrate a lack of good faith. See Kabro Assocs. of West Islip, LLC v. Colony Hill Assocs. (In re Colony Hill Assocs.), 111 F.3d 269, 276 (2d Cir. 1997) ("[t]ypically, the misconduct that would destroy a [buyer]'s good faith status at a judicial sale involves fraud, collusion between the [buyer] and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders"); see also In re Angelika Films 57th, Inc., Civ A. No. 97-2239 (MBM), 1997 WL 283412, *7 (S.D.N.Y. May 29, 1997); In re Balcalis, 220 B.R. 525, 537 (Bankr. E.D.N.Y. 1998). Due to the absence of a bright line test for good faith, the determination is based on the facts of each case, concentrating on the "integrity of [an actor's] conduct in the course of the sale proceedings." In re Pisces Leasing Corp., 66 B.R. 671, 673 (E.D.N.Y. 1986) (quoting In re Rock Indus. Mach. Corp., 572 F.2d 1195, 1998 (7th Cir. 1978)).

60.     The Debtors submit Pivotal is or would be a "good faith purchaser" within the meaning of section 363(m) of the Bankruptcy Code and the APA, or any marked version thereof, is or would be a good faith agreement on arm's-length terms entitled to the protections of section 363(m) of the Bankruptcy Code.  First, the consideration to be received by the Debtors pursuant to the APA is substantial, fair and reasonable. Second, the parties entered into the APA in good faith, and after extensive, arm's-length negotiations, during which both parties were represented by competent counsel of similar bargaining positions. Third, there is no indication of any "fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders" or similar conduct that would cause or

permit the Sale or APA to be avoided under section 363(n) of the Bankruptcy Code. <u>Finally,</u> Pivotal's offer was evaluated and approved by the board in consultation with the Debtors' professionals. Accordingly, the Debtors believe that Pivotal and APA (or marked APA) should be entitled to the full protections of Section 363(m) of the Bankruptcy Code.

**B.  The Sale Should be Approved "Free and Clear" Under § 363(f).**

61.    Section 363(f) of the Bankruptcy Code permits the Debtors to sell assets free and clear of all liens, claims, interests, charges and encumbrances (with any such liens, claims, interests, charges, and encumbrances attaching to the net proceeds of the sale with the same rights and priorities therein as in the sold assets). As Bankruptcy Code section 363(f) is stated in the disjunctive, when proceeding pursuant to section 363(b), it is only necessary to meet one of the five conditions of section 363(f). <u>Citicorp Homeowners Servs., Inc. v. Elliot,</u> 94 B.R. 343, 345 (Bankr. E.D. Pa. 1988); (stating that Bankruptcy Code section 363(f) is written in the disjunctive; holding that if any of the five conditions of § 363(f) are met, the trustee has the authority to conduct the ale free and clear of all liens).   The Debtors believe that they will be able to demonstrate at the Sale Hearing that they have satisfied one or more of these conditions.

62.    Finally, the Sale Order will provide that the distribution of Sale Proceeds will be pursuant to the terms of an APA or confirmed plan.

63.    The Debtors believe that a 363 sale of the Debtors' assets and a structured dismissal of this case (which would have been the result if the final GTT

bid was accepted) is not warranted by either the Bankruptcy Code or the facts of this case.

64.    As a result of the recent 363 sales approved in General Motors, Chrysler and Lehman Brothers commentators and Bankruptcy Courts have started to re-examine the propriety of approving a 363 sale of all or substantially all of Debtors' assets outside the sale being incorporated into a Plan of Reorganization absent special protections.

65.    Recently in *In re On-Site Sourcing, Inc.* 412 BR 817 (Bankr. E.D. Va. 2009) and *In Re Gulf Coast Oil*, 404 B.R. 407(Bankr. S.D. Tex. 2009) two courts in separate parts of the country denied approval of a 363 sale the payment of the sales proceeds were structured in a manner that would effectively "evade the carefully crafted scheme" of the Chapter 11 plan confirmation process. *Gulf Coast Oil* at 422. It is also important to note that, in both cases, the argument was made that the proposed payments to be made to junior creditors outside the priority scheme established by the Bankruptcy Code was a gift was rejected.

66.    The GTT bid that was submitted to the Board would have resulted in junior unsecured creditors being paid ahead of administrative and priority creditors outside of a plan confirmation process.

67.    The Pivotal bid recommended by the Board did not possess the same Bankruptcy Code structural infirmities as did the GTT bid since it envisioned a Plan confirmation process.

WHEREFORE, for all the reasons set forth herein, the Debtors respectfully request that the Court enter an order, in substantially the form attached hereto, (i) approving the Debtors' selection of Pivotal Global Capacity LLC as the qualifying bidder for substantially all the assets of the Debtors, and (ii) granting such other and further relief as is just and proper

Dated: Wilmington, Delaware

November 8, 2010

**WOMBLE CARLYLE SANDRIDGE**
**& RICE, PLLC**

/s/ Francis A. Monaco, Jr.
Francis A. Monaco, Jr. (DE Bar No. 2078)
Mark L. Desgrosseilliers (DE Bar No. 4083)
Thomas M. Horan (DE Bar No. 4641)
222 Delaware Avenue, Suite 1501
Wilmington, DE 19801
Telephone: (302) 252-4320
Facsimile: (302) 252-4330
E-mail: fmonaco@wcsr.com
E-mail: mdesgrosseilliers@wcsr.com
E-mail: thoran@wcsr.com

-and-

Douglas S. Draper (LA Bar No. 5073)
William H. Patrick, III (LA Bar No. 10359)
Leslie A. Collins (LA Bar No. 14891)
**Heller, Draper, Hayden, Patrick & Horn, LLC**
650 Poydras Street, Suite 2500
New Orleans, Louisiana 70130-6103
Telephone: (504) 299-3300
Facsimile: (504) 299-3399
E-mail: ddraper@hellerdraper.com
E-mail: wpatrick@hellerdraper.com
E-mail: lcollins@hellerdraper.com

*Attorneys for the Debtors and*
*Debtors-in-Possession*